**HOECHST CELANESE CORPORATION, D/B/A Hoechst Celanese Plastics Company, Appellant,**

v.

**ARTHUR BROS., INC., Appellee.**

No. 13–93–077–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1994.

Roberta J. Hegland, Clay E. Coalson, and David A. Sibley, Meredith, Donnell & Abernethy, Corpus Christi, for appellant.

J. Norman Thomas, Harris & Thomas, Corpus Christi, for appellee.

Before KENNEDY, GILBERTO HINOJOSA, and FEDERICO HINOJOSA, Jr., JJ.

## OPINION ON MOTION
## FOR REHEARING

KENNEDY, Justice.

After considering appellee's motion for rehearing, we withdraw our opinion of July 21, 1994 and enter this opinion in its place. We otherwise deny the motion for rehearing. The appellant's motion for rehearing was also overruled.

Arthur Brothers, Inc. ("ABI") recovered damages against Hoechst Celanese Corporation ("HCC") based on findings of fraud and promissory estoppel. The jury found that HCC lied when it induced ABI to accept a nine-month contract by representing that, if ABI improved over a nine-month period, ABI could retain its long-time role as maintenance contractor at HCC's chemical plant in Bishop, Texas. By eight points of error, HCC appeals. We suggest a remittitur. If the remittitur is filed, we modify the judgment and affirm. If the remittitur is not filed, we must reverse and remand the entire case.

ABI began serving as maintenance contractor at the Bishop plant for Celanese around 1950. In 1985, ABI earned the maintenance contracts at Celanese plants in the Texas cities of Bishop, Pampa, Bay City, and Corpus Christi. ABI outbid competitors including the Mundy Company. Mundy maintained several Celanese plants including the Clear Lake plant near Houston.

The German company Hoechst took over Celanese in 1987, changing the name to Hoechst Celanese Company. In 1988, HCC created a task force to consider hiring a regional maintenance contractor. The task force included the maintenance supervisors at HCC's Texas plants, among them Bishop's Dave Siemonsma and Clear Lake's Howard "Scotty" Wilmeth. The task force determined that a regional contractor would serve HCC's needs better than the patchwork of contractors then employed. The task force also decided that an individual facility could opt out of the regional contract if justified.

The task force received bids for a three-year contract from seven contractors. It whittled the list to three finalists: Fluor Daniel, ABI, and Mundy. ABI had the lowest bid, followed in order by Mundy and Fluor Daniel. HCC considered factors other than price and chose Mundy as the Texas contractor. The corporate office prepared a standby press release in April announcing the changeover for the Bishop plant.

Wilmeth, meanwhile, had become the manufacturing services manager at Bishop in October 1988. He supervised Siemonsma, among others. Both men felt Mundy had the clearly superior bid. Wilmeth preferred Mundy based both on the bids and on his experience with Mundy at Clear Lake (sev-

enteen years, three of which he spent working closely with them as maintenance supervisor) contrasted with his six-month experience with ABI at Bishop. Wilmeth and Siemonsma wanted to go along with the regional recommendation and have Mundy as the contractor at Bishop.

The decision was not theirs alone to make, however. Under HCC's corporate structure, a contract of this monetary magnitude required corporate-level approval. Bishop's plant manager, Darrell Pausky, wrote to Ed Munoz at the corporate office in April, expressing concern about negative public reaction possibly attendant to ending the plant's longstanding relationship with a local company (ABI was based in nearby Kingsville) in favor of an unknown outsider. Pausky acknowledged ABI's relative weakness, but said he believed Bishop should allow ABI the opportunity to improve its performance. He enclosed a proposed nine-month contract and wrote that proposed areas of deficiency and expectations of improvement would be identified in a contract supplement. Munoz agreed with Pausky.

Wilmeth and Siemonsma then met with the owners of ABI, Aaron Starks, Larry Smith, and Dick Urban. The HCC managers expressed their concerns about ABI's performance. Wilmeth even told them he preferred Mundy, and may have told them that he did not even consider ABI's bid the third best of the bids received. Wilmeth and Siemonsma gave ABI a list of areas to improve. This list, entitled "Continued Improvement Plan," became Schedule I of the contract. Schedule I listed six areas of improvement: foreman management skills, craftsman skills, crew mix management, company improvement, general, and action plans and schedules. Each of these areas had one to three enumerated expectations. The overall heading stated that "[c]ontractor [ABI] agrees to achieve satisfactory improvement progress in the following areas, and to furnish the company [HCC] with evidence of these improvements."

The nature of the promised result of compliance with Schedule I essentially forms the basis of this lawsuit. Wilmeth insisted that he presented Schedule I as suggested improvements and not as an all-inclusive list. Both HCC managers contended they said that compliance would give ABI only the opportunity to be considered for extension. They denied making any guarantees. ABI's Starks and Smith, by contrast, testified that Wilmeth told them that if ABI achieved significant improvement in the nine months that they would get a contract for two years and three months. On further examination, Starks and Smith agreed with statements that compliance meant *opportunity* for renewal, but at other times reiterated that compliance *guaranteed* renewal. Everyone agreed that HCC was the sole judge of ABI's compliance.

ABI's owners agreed to the nine-month contract to begin May 1, 1993. They requested by letter of April 24, 1993 that Schedule I be included as part of the contract. The contract contained in Article 37 the following exclusionary clause:

(a) This Contract constitutes the entire agreement between Contractor and Company relating to the work. There are no previous or contemporaneous representations or warranties of Company or Contractor not set forth herein.

(b) Except as specifically provided herein, no modification, waiver, termination, rescission, discharge, or cancellation of this Contract or of any terms thereof shall be binding on Company unless in writing and executed by an officer or employee of Company specifically authorized to do so.

HCC president Tom Bohrer signed the contract; there was some evidence that this occurred as late as June 1989.

ABI considered moving supervisor Pat Ley from HCC's Pampa plant to help Bishop comply with the contract. Ley came to Bishop on May 19, 1989 to talk to the owners about their plans. He testified that the HCC local managers told him that, if ABI complied with the contract (particularly Schedule I), then ABI most certainly would get the new contract. Ley agreed to move to Bishop with ABI rather than accept a position with HCC in Pampa.

ABI submitted a progress report pursuant to the contract on August 1, 1989. The

report detailed ABI's efforts to comply with Schedule I. The overview stated that ABI was undergoing a tremendous change in culture and the way it conducted its daily business. The report spoke of "a rebirth," "a complete change of our business culture and value systems," and "a change of our moral fiber." The overview states, "The change will not occur quickly and, more importantly, will never be complete."

The report detailed the large number of changes. Under Ley's influence, ABI implemented a team management and quality control program modeled on HCC's programs in Pampa. They improved the crew-mix ratio from .7 helpers per craftsman to 1.4.[1] The report outlined the various teams, training, vision statements, handbooks, and the like that had developed in those first three months.

The parties did not meet until September 19, 1989 to discuss the August report. ABI officials laid blame for the delay at HCC's feet. Participants left the meeting with different views of HCC's evaluation of ABI's progress. ABI's Smith thought that HCC was dissatisfied only with ABI's reporting style, not the substance of its reforms. In a memorandum of the meeting sent to all attenders, Siemonsma made his position unambiguous: HCC was not satisfied with ABI's progress. He stated in his memo that, while HCC recognized that ABI had done much work, it was not satisfied generally or specifically with ABI's improvement. He attached to the memo a point-by-point evaluation of ABI's progress on the expectations set out in Schedule I. He criticized ABI throughout the memo for lacking clear written plans on these areas, for failing to submit reports, and for failing to improve. He dismissed the crew-mix ratio improvement as insignificant and criticized the information provided on this ratio as unhelpful. He noted that ABI continued to have serious safety violations in its scaffolding at the plant. He demanded that ABI present a written response to these concerns.

ABI responded as requested and began submitting monthly reports. ABI also asked for more meetings with HCC officials, who rejected or ignored the requests. The only meetings held were between Siemonsma and Ley to coordinate the maintenance under the contract. ABI's Ley felt he did not get much guidance from these meetings. He said his queries on how ABI was doing were met with generic, noncommittal responses. HCC officials testified that they did not want to give much guidance for two reasons. They wanted a maintenance contractor who could anticipate their needs and teach them rather than have to be led and instructed. They also wanted to avoid controlling ABI and blurring the line between contract employees and HCC employees to the point that ABI employees were coemployees.

HCC officials met on December 11 to discuss ABI's progress. HCC officials testified that they held the meeting then, more than six weeks before the end of the contract, because they needed to make a decision in enough time to allow a transition; they also needed to hold the meeting before people left for the holidays. The latest ABI report on hand covered activities through October. HCC received ABI's November report on December 15. One HCC official said he thought they discussed some November activities, but the report from the meeting explicitly mentions activity only from May through October 30. The report tracks ABI's progress on the expectations in Schedule I. It also contains a general comments section. The evaluation was unfavorable.

Joe Mundy, president of Mundy, testified that Wilmeth called him sometime between December 15 and 20 and told him to prepare a transition plan in case Bishop switched to Mundy. HCC officials met on January 10 with Mundy officials. Knowing that he would have to move quickly if a change was made, plant manager Pausky got corporate approval of Mundy before this meeting (he admitted on cross-examination that he did

1. This ratio is a cost efficiency measure. HCC wanted as high a ratio of the lower-paid helpers per craftsman as possible without compromising the quality. HCC felt that ABI had too many workers at the highest pay levels.

This issue is doubly sticky because of the structure of the agreement. ABI received a percentage markup over its workers' wages. Thus, the higher the workers' wages, the more money ABI received.

not have to change contractors at the end of January). He said he was not happy with ABI, but not sure that Mundy would be better. At the end of the meeting, however, he offered the contract to Mundy. Mundy accepted.

HCC officials met with ABI officials on January 11 to inform them of the change. Pausky read from a prepared statement. He expressed appreciation for ABI's effort, but noted that the managers at Bishop felt isolated from the rest of HCC in maintenance. He said the contractor needed to stay ahead or keep up with the rapid changes in safety and environmental regulations and technology with minimal input from HCC. He noted that ABI lacked the critical mass, resources, and management systems to meet these needs. ABI agreed to assist in the transition to Mundy.

Mundy hired all but about fifteen of the nearly four hundred ABI employees at Bishop. The real change was at the management level where Mundy brought in eight of its own people. Wilmeth likes Mundy's performance. Their safety record is better than ABI's record. They have apprised HCC–Bishop of new safety regulations before HCC informed the contractor or the Bishop managers. Mundy has also led HCC in advances such as having employees wear safety harnesses rather than merely belts to reduce injuries and long-sleeved shirts to prevent burns.

After the termination, ABI refocused on its construction arm. ABI fired Aaron Starks, and its maintenance division went dormant. The construction division prospered and eventually incorporated as a separate company, leaving ABI an empty shell.

The jury found HCC liable to ABI for damages through fraud and promissory estoppel. The jury found that, because of HCC's promise, ABI's maintenance arm incurred $225,623 in reasonable and necessary expenses and that its construction arm lost $477,202 in profits. These numbers equal the $702,825 amount that the jury found for ABI's fraud damages. The jury assessed

$2,108,469 in punitive damages; this number corresponds to the actual damage total, less two dollars, times three. The court awarded these damages unaltered.[2]

■ By its first two points of error, HCC attacks the existence of a cause of action for fraud. By point one, HCC complains that the undisputed facts support no fraud action. By point two, HCC argues that the evidence is legally or factually insufficient to support the finding of fraud. The jury instruction provided as follows:

A party commits "fraud" if:

(1) a party makes a misrepresentation;

(2) the misrepresentation is made (a) with knowledge of its falsity or made recklessly without any knowledge of its truth, and (b) as a positive assertion;

(3) the misrepresentation is made with the intention that it should be acted on by the other party; and

(4) the other party acts in reliance on the misrepresentation and thereby suffers injury.

"Misrepresentation" means a false statement of fact or a promise of future performance made with an intent not to perform as promised.

ABI premised its fraud action on the assertion that HCC authorities represented that, if ABI significantly improved its performance during the nine-month contract, it would get a new contract for the remainder of the three-year period. ABI contended that HCC never intended to consider ABI for the longer contract, but allowed them to continue briefly for public relations purposes. ABI contended that HCC intended that ABI rely on this representation and begin the processes of reform so that the contractor HCC truly desired would not be seen as the bearer of unwanted change. ABI asserted that its reliance caused it to incur expenses for improvements and to lose profits in its construction arm. The jury found that HCC had committed fraud against ABI as defined.

2. The court awarded $702,825 in actual damages, not distinguishing between lost profit damages and others. Neither did the court specify whether the damages were for fraud or promissory estoppel.

HCC argues that the existence of the contract destroyed the basis of any fraud action. HCC contends that any losses either arose from the failure to renew the contract or are purely economic and, thus, give rise only to a contract claim. HCC contends that the exclusionary clause in Article 37 precludes any reliance on oral representations regarding additional contracts.

Article 37, however, states only that the contract is the comprehensive and exclusive agreement as to the work of the nine months. It does not address renewal, extension, or new contracts. Wilmeth stated repeatedly that Schedule I, the list of improvements ABI agreed to make under the contract, was not a complete list of the areas ABI needed

to improve in order to earn the longer contract. He insisted that ABI could improve (sustaining the contract) but not receive the new contract. The representation regarding renewal was separate from and not excluded by the contract. This fact distinguishes our case from those cases which HCC submits require erasure of the fraud judgment.[3] Accepting ABI's version of events as true, there was a misrepresentation that ABI relied upon to its detriment. We overrule point one.

■■■ We employ different levels of scrutiny when assessing the legal and factual sufficiency of the evidence. In reviewing an attack on the legal sufficiency of the evidence or a "no evidence" point, we consider only

---

**3.** *See Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493 (Tex.1991). In *DeLanney,* the court held that a plaintiff may make both tort and contract claims only if the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties. *Id.* at 494. When a defendant's botched repair of a water heater caused the heater to ignite the roof and burn down the house, both types of actions existed. But when a defendant failed to execute a contractual duty (proper placement of an advertisement in the Yellow Pages), the failure to place the ad breached duties only under the contract, not under negligence law. *Id.* at 495. Our case is distinct in that it concerns fraud separate from the subject of the contract.

*See also Jim Walter Homes v. Reed,* 711 S.W.2d 617 (Tex.1986), *Central Sav. & Loan Ass'n v. Stemmons Northwest Bank, N.A.,* 848 S.W.2d 232 (Tex.App.—Dallas 1992, no writ), and *Allen v. Allen,* 751 S.W.2d 567 (Tex.App.—Houston [14th Dist.] 1988, writ denied). HCC cites these cases for the proposition that a claim sounds only in contract if all of the damages are economic and flow from the termination of the contract. *Reed,* 711 S.W.2d at 618; *Central,* 848 S.W.2d at 238; *Allen,* 751 S.W.2d at 575. Our case is distinct because the damages flow from the misrepresentation regarding the granting of a long-term contract, not from the contract entered in this case.

*See also River Consulting, Inc. v. Sullivan,* 848 S.W.2d 165 (Tex.App.—Houston [1st Dist.] 1992, writ denied). River Consulting sued the Sullivans for breach of contract and resulting accounts receivable. *River Consulting,* 848 S.W.2d at 167. River later filed a claim against the Sullivans for fraud. *Id.* River claimed that the Sullivans never intended to pay River, but deliberately misled River to keep them on the job by promising to pay and give much future work to River. *Id.* at 170. The court rejected these claims because the breached duty to pay arose out of the contract. *Id.* Our case is different because there is no question that HCC fully paid

ABI on the nine-month contract. The fraud claim here pertains purely to the representation regarding contract renewal, which is outside the boundary of the written, nine-month agreement.

*See also Airborne Freight Corp. v. C.R. Lee Enterprises, Inc.,* 847 S.W.2d 289 (Tex.App.—El Paso 1991, writ denied). Lee provided Airborne customers with pickup and delivery services. In August 1987, they entered a Cartage Agreement. The agreement provided that either party could terminate the agreement on thirty days' notice. It also specifically disclaimed any representations or reliance on any representations regarding the length of the contract term. *Airborne,* 847 S.W.2d at 291. In 1989, an Airborne representative told Lee "as long as you do your job, you'll have a job." Lee then complied with Airborne's oral requests for expansion. In 1990, Airborne grew dissatisfied with Lee's performance and terminated the agreement according to its terms. The appeals court found no fraud. *Id.* at 297. The contract here had a definite term which was fulfilled, though HCC could have cancelled it without cause on seven days' notice. The fraudulent statement in this case was made apart from the contract about the possibility of an additional contract.

*See also Goodyear Tire & Rubber Co. v. Portilla,* 836 S.W.2d 664 (Tex.App.—Corpus Christi 1992, writ granted). Portilla was assured that she would have a job so long as she performed satisfactorily. *Portilla,* 836 S.W.2d at 667. She was fired. The court granted summary judgment against her fraud claim, but the jury found for her on her breach of contract and negligence claims. We found that the trial court should not have submitted the negligence claim because her damages flowed strictly from the breach of contract; that was not a dispositive issue since we affirmed the breach of contract finding. *Id.* at 671. The judgment against the fraud claim was not raised on appeal. Our case is distinct because it involves fraud apart from the contract.

the evidence and reasonable inferences that tend to support the jury findings, and disregard all evidence and inferences to the contrary. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989). In reviewing a challenge to the factual sufficiency of the evidence, we look at all of the evidence both favoring and opposing the jury's determination. *Plas–Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Corpus Christi Area Teachers Credit Union v. Hernandez,* 814 S.W.2d 195, 197 (Tex.App.—San Antonio 1991, no writ). Having done so, we will set aside the verdict only if the evidence standing alone is too weak to support the finding, or the answer is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate,* 244 S.W.2d 660, 661 (Tex. 1951). We find that sufficient evidence supports the jury's finding of fraud.

Sufficient evidence supports the finding of the alleged representation. ABI officials and Joe Mundy, president of the Mundy Company, testified that HCC officials represented to ABI officials that, if ABI significantly improved, it would get the longer-term contract. This is sufficient even though the ABI officials testified inconsistently and HCC officials flatly denied making the representation.

■ There is sufficient evidence that the representation was false and made with knowledge of its falsity. Denial that a promise was made is a factor in showing no intent to perform the promise. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992); *Spoljaric v. Percival Tours,* 708 S.W.2d 432, 435 (Tex.1986). Failure to perform an agreement to perform in the future, plus slight circumstantial evidence of fraud,

is sufficient to support a finding of fraudulent intent in making the agreement. *Schindler v. Austwell Farmers Co-op.,* 829 S.W.2d 283, 286 (Tex.App.—Corpus Christi 1992), *modified,* 841 S.W.2d 853 (Tex.1992). HCC clearly did not perform by granting the long-term contract. The maintenance supervisors' unrepudiated disdain for ABI at the time of the representation, their repeated refusals to meet with ABI officials during the contract period, their mid-December decision not to renew ABI in February based on October information, and Siemonsma's recantation under cross-examination of many of the criticisms contained in HCC's final evaluation all combine to provide sufficient evidence that HCC never intended to give ABI a shot at the longer-term contract. This evidence sufficiently establishes fraudulent intent despite countervailing evidence that HCC officials were open to continuing the relationship with ABI, that its hands-off policy was proper and part of its business plan, and that it needed to decide early to have a smooth transition to a new contractor.

■ HCC undisputedly intended ABI to rely on the representation and undertake improvements. The only evidence is that ABI relied on the representation. The reliance was not rendered unjustified by the contract. As discussed above, the representation was not subsumed into or erased by the contract; it exists apart from and with different conditions than the contract. The reliance is reasonable even though HCC was to be the judge of compliance with the condition of improvement because years of fair dealing indicated that HCC would consider ABI's improvement. ABI's reliance was justified even though the local HCC officials lacked the authority to grant a new contract. The representation was made in the context of presentation of HCC company policy toward ABI, the representers were effectively the sole evaluators of ABI's progress, and the HCC corporate structure had relied on the local officials in accord with their chain of command; HCC's pre-approval of the Mundy contract in January 1990 underscores the possibility of a sufficient degree of local autonomy.

Finally, the evidence supports the finding that the reliance damaged ABI; we will discuss the evidence supporting those damages under point five. We overrule point two.

■ By two points of error, HCC challenges the finding of promissory estoppel. The attacks are couched in the same language as those launched against the fraud claim. By point three, HCC contends that no cause of action exists on the undisputed evidence. By point four, HCC argues that the evidence is legally or factually insufficient to support the verdict. The court asked the question:

Did Arthur Brothers substantially rely to its detriment on Defendant Hoechst Celanese's promise, if any, that if Arthur Brothers made satisfactory improvement progress, it would keep the work at the Bishop facility; and was this reliance, if any, foreseeable by Defendant Hoechst Celanese?

The jury responded, "Yes." The question is not challenged. Under the facts of this case and as defined for the jury, the fraud and promissory estoppel causes of action are not meaningfully distinct. The similarity of the actual damage issues and the identity of the responses underscores this likeness. The court asked the jury the following questions on actual damages:

QUESTION NO. 2

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Arthur Brothers for damages it suffered between May 1989 and January 31, 1990, if any, that were proximately caused by Hoechst Celanese's fraud?

Consider the following elements of damage, if any, and none other.
1. The reasonable and necessary additional expenses, if any, incurred by Arthur Brothers.
2. The lost profits to Arthur Brothers' construction arm, if any.
Answer in dollars and cents, if any.
Answer: $702,825.00

. . . . .

QUESTION NO. 5

What sum of money, if any, would fairly and reasonably compensate Arthur Broth-ers for its damages suffered between May 1989 and January 31, 1990, if any, that resulted from its reliance on Defendant Hoechst Celanese's promise?

Answer separately in dollars and cents, if any, for each of the following elements of damage:
1. The reasonable and necessary additional expenses, if any, incurred by Arthur Brothers.
Answer: $225,623.00
2. The lost profits to Arthur Brothers' construction arm, if any.
Answer: $477,202.00

The promissory estoppel damage total equals the fraud damages. Since the elements of the causes of action are essentially the same, the actual damage findings are identical, and we have affirmed the fraud finding, we need not evaluate the validity of the promissory estoppel finding. See TEX.R.APP.P. 90. We decline to rule on points three and four.

■ By point of error five, HCC challenges the legal and factual sufficiency of the jury's actual damage findings on the fraud issue. Damages need be proved only with reasonable, not absolute, certainty. Berry Contracting, Inc. v. Coastal States Petrochemical Co., 635 S.W.2d 759, 761 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.). The damages must be susceptible of ascertainment in some manner other than speculation and by reference to some fairly definite standard. Id. We will discuss in order the two elements of damage—the maintenance arm's additional expenses and the construction arm's lost profits.

ABI claimed several factors contributed to the additional expenses:

| | |
|---|---|
| Training and education | $ 41,729 |
| Truck expense | 1,600 |
| Increased office expenses | 14,500 |
| Salaries of persons assigned to HCC | 64,500 |
| Officers' salaries (that would have been reduced but for the HCC contract) | 36,000 |
| Payroll overhead on excess salaries (20% of pay) | 20,100 |
| January costs of not scaling back ABI sooner | 58,662 |
| Additional expenditures | 24,532 |
| TOTAL DAMAGES CLAIMED | $261,623 |

The jury reduced the claim by $36,000. It appears that the jury awarded all of ABI's claimed damages except the officers' salaries.

ABI's expert witness for damages, certified public accountant Scott Turner, testified about ABI's damages. He testified that the training and education expenses were required to implement the team management program. The truck expense was incurred by the construction foreman reassigned to work maintenance at HCC for four months. The increased office expenses were attributable largely to the lengthy reports required under the contract. The increased salaries paid owner Aaron Starks $50,000 for his work between May and December and Walter Dombeck $14,500 for his work between May and September. Turner considered the officers' salaries a damage because ABI continued to pay them at an inflated level; had ABI not had the maintenance contract, ABI would have cut the salaries as it did after losing the contract. The payroll overhead (payroll taxes, medical insurance, etc.) tacked on around twenty percent in addition to these excess salaries. The company lost $83,803 in January; Turner estimated that ABI could have saved 70% of that loss had they known that the end of the contract was coming and been able to plan and schedule their expenditures on the reduction in payroll. The additional expenditures came from physicals for employees, drug testing, small tools, other education services related to the team program, and employee recognition expenses.

HCC contends that ABI is not entitled to any of the additional expenses because ABI was contractually bound to improve. At trial, however, HCC's expert witness for damages, CPA Melanie Griffin, did not testify that all of ABI's claims were meritless. Neither did she question the accuracy of the figures Turner used in his assessment of the additional cost damages. She did dispute the assertion that HCC owed ABI many of these debts, contending that some were paid under the contract, while others were specifically excluded from the contract.

Griffin eliminated the small tools expense because the contract provides that, if Celanese supplies tools, the markup provisions will be reduced. She eliminated the salaries and payroll taxes on the salaries for officers Larry Smith and Aaron Starks. She also eliminated the truck expense because it was either not requested or authorized; travel expenses related to the job are payable if authorized, and ABI officials testified that they were fully paid under the contract. She erased the additional office expenses, either because they were not authorized or because they were home office expenses not separately payable under the contract. She also eliminated the January loss because she was not given information for that month. The contract calls for markups on wages (percentages paid in addition to the stated amount) ranging from 29–38.5% to cover payroll taxes, profit, and overhead and unidentified costs.

■■■■■ We find that no evidence supports some of the jury's award. The key flaw in many of the damage awards is that the claimed costs were paid under the contract; ABI does not assert that HCC failed to pay fully under the contract. The truck expense is not sustainable because it was either related to work, claimed, and paid; related to work, but unclaimed, and thus forfeited; or not related to work and not owed by HCC. Whichever is accurate, ABI undisputedly transferred the truck driver to try to comply with the contract, and thus any costs caused by that move fall under the contract. The increased office expenses are similarly not recoverable. The testimony favoring the award was that these expenses were accrued in preparing the extensive new reports which were required under the contract; they were thus compensated under the contract and not attributable to the fraud. Further, if these expenses arose from activities at the home office, the contract explicitly spared HCC from obligation for them.

■■■ The salaries of officers Starks and Smith are not recoverable. The contracted-for improvements in ABI included better management. The owners' salaries were the decision of ABI and payable out of the company's earnings, much of which stemmed from this contract. These salaries were explicitly not payable by HCC under the contract. The decrease in the salaries after the

HCC contract ended supports the claim that their salaries would have been lower if not for the nine-month HCC contract, but the claim for the difference as damage ignores the undisputed fact that ABI was paid under the contract. There is no showing that the salaries were due to the misrepresentation rather than the contract. The overhead on these benefits likewise is not recoverable as damages.

■ The claim for loss due to the sudden shutdown in January is not supported. There is no showing that the sudden shutdown was not allowable under the contract. Rather, the contract allowed for termination on seven days' notice during the term of the contract; HCC gave ABI notice that it would not get a new contract twenty days before the end of the contract. There was absolutely no showing of how these nebulous costs would have been avoided by earlier notification. ABI failed to show that these damages were attributable to the fraud rather than procedure allowed by the contract. There was no showing that these costs would not have accrued by the rapid April 1989 shutdown aborted by the contract. Finally, this complaint of late notification is inconsistent with ABI's claim that HCC decided not to renew the contract prematurely, indicating fraud. We reverse and render as to these unsupported damages.

■ We find sufficient evidence to support some of the claims. The training expenses were attributed to the introduction of the team management concept. Though the contract calls for restructuring the management, HCC officials repeatedly testified that the team-management concept was appropriate, if at all, for the long-term—just the sort of expense incurred by a company misled into believing that there could be a long term. HCC's expert did not eliminate this expense in her refiguring of Turner's damage summary. She likewise did not erase the expense for Walter Dombeck's salary; he was not an officer and the claim that his work was due to the misrepresentation was not disputed. The payroll tax on his salary also survives. Of the remaining additional expenditures, Griffin challenged only the small tools expense. She alleged how it

might have been taken care of by the contract, but she did not show that the markups actually had been lowered to compensate for any expense. Turner said the other additional expenses include additional expenses for team management training and achievement awards. The evidence supporting these additional expenses is paper-thin, but there is no evidence to outweigh it. We defer to the jury and affirm as to these expenses.

We partially sustain and partially overrule point five because we find no evidence to support some of the damages awarded, but sufficient evidence to support others. We render the following revised actual damage recovery for additional expenses due to the misrepresentation:

| | |
|---|---|
| Training and education | $41,729 |
| Additional salaries | 14,500 |
| Overhead on excess salaries (20% of pay) | 2;900 |
| Additional expenditures | 24,532 |
| TOTAL | $83,661 |

■ We now turn to the award for lost profits of the construction arm. HCC contends that lost profits are not available as a measure of damages in a fraud case, citing *C & C Partners v. Sun Exploration and Prod. Co.*, 783 S.W.2d 707, 719 (Tex.App.—Dallas 1989, writ denied). That court wrote:

> The measure of damages in fraud cases is the actual amount of the complaining party's loss resulting directly and proximately from the fraud practiced upon him. The desired end is actual compensation for the injury, not lost profits.... Speculative losses and lost profits are not recoverable in an action for fraud.

*Id.* (citations omitted). Yet the supreme court has endorsed lost profits in some contexts as special damages. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex.1983). In *Trenholm*, a developer recruited a builder for his Plano, Texas residential development by telling the builder that a mobile home park next to the development would be replaced by a shopping center. The builder built several moderately expensive homes. The trailer park never moved, and the builder lost money because of the resultant deflated value of the homes. The court found that the

evidence supported the jury's finding that the builder's lost profits flowed directly from the reliance on the misrepresentation. The court also found that the evidence was not too speculative regarding the extent of the loss, based on his customary and expected profit margin. *Id.* We find that fraud can result in lost profits for a service provider that are directly and not too speculatively traceable to the fraud.

 That said, we find no evidence to support the lost profits here. The proof required to recover lost profits is similar to that of other damages. The amount need not be shown by exact calculation, but must be shown by competent evidence with reasonable certainty. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80 (Tex.1992). It is a fact-intensive determination. *Id.* Profits must be possible before they can be considered lost. *Id.* at 85; *see also Berry Contracting,* 635 S.W.2d at 761 (citations omitted). Profits such as those dependent on uncertain or changing market conditions or on chancy business opportunities are too speculative to be recovered. *Texas Instruments, Inc. v. Teletron Energy Management,* 877 S.W.2d 276 (Tex.1994) *reh'g overruled,* 37 Tex.Sup.Ct.J. 819 (June 2, 1994). In *Heine,* the supreme court reversed an award of lost profits to a plaintiff who had two bulldozers, debilitating damage to one of which was the basis of the damage claim. 835 S.W.2d at 84–85. The court reversed largely because the plaintiffs were not able to specify which contracts they lost, how many they lost, how much profit they would have had from the contracts, or who would have awarded them contracts; the court held that the plaintiffs could have supported their claim with testimony of specific contracts lost, but the bare assertion that contracts were lost did not demonstrate a reasonably certain objective determination of lost profits. *Id.* at 85.

 ABI's expert did a better job than the Heine's expert, but failed similarly. The expert submitted ABI's sales figures for 1990 and 1991, opining that these figures accurately showed the amount of construction business ABI could do when not distracted by the maintenance contract; sales increased in 1990 by 88% over 1989, then increased an additional 41% in 1991. He found the average sales per month for 1990 and 1991, subtracted the average sales per month during the contract period, multiplied that difference by the percentage of sales as profit for 1990–91, and multiplied that figure by nine to cover the contract term. Though HCC's expert quarrelled with many aspects of his methodology to reach these figures, we find it provides legally insufficient evidence. ₒ

The key flaw in the evidence is that there is absolutely *no* showing that the 1990 and 1991 sales figures have any relevance to the theoretical 1989 figure. Clearly, the sales figures increased dramatically in 1990 and 1991. But sales also increased by 70% in 1989 over 1988 while ABI was supposedly unable to properly attend its construction branch. We look at this last figure, not to weigh against ABI's figure supporting the jury award, but to underscore the critical lack of probative value of increased sales in 1990 and 1991 standing alone. There is no evidence that ABI failed to bid on any projects because of its redirection of two construction staff members to the maintenance arm. There is no evidence of any bids lost because of ABI's distraction; to the contrary, the only evidence showed that ABI was successful on two of nineteen bids in the May–July 1989 quarter, with assertions that ABI would be bidding more actively in the rest of the year. There is no evidence that any lost bids resulted from the fraud rather than merely the contract; losses due to redirection of staff to comply with the contract do not support damages due to misrepresentation. The evidence shows, not that the increased staff and focus caused the increased sales in 1990 and 1991, only that 1990 and 1991 continued the trend of increased construction that began in 1989. We find no evidence to support the finding of lost profits. We sustain point five as to the lost profits on fraud.[4]

4. The supreme court reversed and remanded *Heine* for a new trial on lost profits. 835 S.W.2d at 86. The court explained that decision was unique because it was associated with a no-answer default judgment. *Id.* As the damages here were awarded after a full trial, our finding of legally insufficient evidence causes us to fol-

By point of error six, HCC challenges the award of actual damages for promissory estoppel. Though we declined to rule on the vitality of the estoppel claim, we briefly consider the merits of the damage issues to demonstrate that remand is not necessary. The damages for the expenditures to comply with the broken promise are the same as for fraud. Lost profits are not allowable under promissory estoppel. *Fretz Constr. Co. v. Southern Nat'l Bank of Houston*, 626 S.W.2d 478, 483 (Tex.1982). The damages for promissory estoppel thus do not exceed the damages for fraud as reformed. Remand is therefore not required. We sustain and overrule point six in the same manner as point five.

By point of error seven, HCC contends that the court erred harmfully when it took judicial notice of HCC's net worth. The court, over HCC's objection, accepted *Moody's International Manual* as a source whose accuracy could not reasonably be questioned. Tex.R.Civ.Evid. 201(b)(2). We need not delve into the propriety of the court's action because we find that it was not harmful. *See* Tex.R.App.P. 81(b)(1). The court instructed the jury to accept as conclusive the fact that HCC's net worth was $3,413,000,000. The court also instructed the jury that it could consider the net worth of the wrongdoer in assessing punitive damages. HCC contends that the judicially noticed net worth, coupled with ABI's repeated David-and-Goliath type references to HCC's size during argument, caused the jury to award $2,108,469 in punitive damages. We disagree.

There is no indication that the *Moody's* evidence affected the jury. The jury had numerous other indications of HCC's relative size, for instance: the relative complexity of the corporate structure, the size of the contracts discussed, the number of plants in Texas alone, the number of employees, and the purchase by a foreign company. Further, the jury did not blindly do ABI's bidding. Though the jury found virtually all of the actual damages ABI requested, it did not punish HCC nearly as much as ABI's attorney said that it could. He told them punitive

damages were usually three to ten times the actual damages. The jury awarded slightly less than three times the actual damages. We find that any error in taking judicial notice of HCC's net worth was harmless. We overrule point seven.

By point of error eight, HCC contends that the record does not support the award of punitive damages. HCC alternatively requests remittitur of the punitive damage award. HCC premises its argument primarily on its contention that there were no actual damages from fraud. We have found that not to be the case. We must examine the evidentiary underpinnings of the punitive damages award, however. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 21–30 (1994). The *Pool* standard of factual sufficiency still prevails. *Id.*, citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). Punitive damages must be supported by sufficient evidence adjudged against a preponderance of the evidence at the trial court. *See Moriel*, 879 S.W.2d at 31.

The process of awarding punitive damages is highly subjective. The court correctly instructed the jury to consider the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, the extent to which such conduct offends a public sense of justice and propriety, the net worth of the wrongdoer, and compensation for inconvenience and attorney's fees. *See Tatum v. Preston Carter Co.*, 702 S.W.2d 186, 188 (Tex.1986) (*quoting Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981)). The jury could consider fraud an act deserving of punishment. They found that HCC deliberately misled ABI, a long-time service provider, into undertaking a massive restructuring without giving ABI a genuine chance to succeed. The jury could have believed that HCC did so to reduce public unhappiness by appearing to be fair, but reap the benefits of the changes and pass them along to the new contractor. The jury could have felt that HCC did this in callous disregard of ABI's heavy economic and psychological reliance on

low the general rule and render judgment against any lost profits damages.

HCC. The jury may have deemed HCC's attempts to help ABI comply feeble. The jury knew that HCC was a big corporation. The jury also knew that the fraud and termination rocked ABI financially and emotionally. HCC's insistence that it had done nothing wrong, instead of weighing against the award of any damages, may have incensed the jury. The jury was justified in awarding punitive damages.

■ The size of the award, however, is excessive. The jury made its award in part based on its actual damage award finding, large portions of which we have found not justified by the evidence. Because we have found evidentiary support for a vastly lower level of offensive conduct, we find the nature of the wrong and the character of the conduct much less offensive to the public sense of justice. We therefore find justification for a much smaller punitive damages award. The trial court should have granted HCC's request for remittitur. Since the award of punitive damages is the only basis for reversal and remand of this case, we suggest remittitur of the punitive damage award. *See* TEX.R.APP.P. 85(c). Based on the *Alamo Nat'l Bank* factors, we find that HCC's conduct justifies a punitive damage award of $260,000.

We suggest a remittitur of the punitive damages exceeding $260,000. If ABI files the remittitur within fifteen days of the date of this opinion, we will reform the judgment accordingly. We will then affirm the finding of fraud, though we will modify the actual damage award to $83,661, plus pre- and post-judgment interest as ordered by the trial court. As modified, we will affirm the judgment. If ABI declines to file the remittitur within fifteen days of the date of this opinion, we must forgo any affirmation and reverse and remand the case entirely. *See* TEX. R.APP.P. 81(b)(1).