TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00210-CV







Beverly California Corporation and Beverly Enterprises-Texas, Inc., Appellants



v.



Kelcy Robinson, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT


NO. 93-02735, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING








 Kelcy Robinson sued to recover damages for personal injuries she sustained while
residing at the "Arbor," a nursing home owned by Beverly Enterprises-Texas, Inc., a subsidiary
of Beverly California Corporation. (1) A jury found appellants negligent and grossly negligent and
awarded Robinson $120,000 in actual damages and $240,000 in exemplary damages. The trial
court rendered judgment in accordance with the jury verdict. We will affirm the trial-court
judgment.



THE CONTROVERSY


 Kelcy Robinson entered the Arbor on December 9, 1986. She resided there until
February 1993 when her family enrolled her in another nursing facility. By the end of her stay
at the Arbor, Robinson had developed senile dementia and urinary and bowel incontinence. She
was confined to bed and to a wheelchair while residing at the Arbor.

 Robinson alleged her injuries were proximately caused by appellants' negligence
in failing to: (1) assure that Robinson was supervised and safeguarded to the extent necessary to
prevent her from leaving the building and injuring herself; (2) discover that Robinson had left the
building until notified by nonemployees; (3) assure that Robinson and her living areas were kept
clean on a regular basis; (4) respond timely to call lights or changes in Robinson's condition; (5)
care properly for Robinson's skin rash; (6) have sufficient numbers of patient-care employees; and
(7) have properly trained patient-care employees.



DISCUSSION AND HOLDINGS


 In their first point of error, appellants complain there was no evidence and,
alternatively, factually insufficient evidence, to support the jury's answers regarding gross
negligence and punitive damages. Appellants do not dispute the jury's findings of negligence;
they claim instead that the evidence did not show their negligence amounted to the conscious
indifference necessary to justify the punitive-damage award.

 "`Gross negligence' means more than momentary thoughtlessness, inadvertence,
or error in judgment. It means such an entire want of care as to establish that the act or omission
was the result of actual conscious indifference to the rights, safety, or welfare of the person
affected." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(5) (West Supp. 1995); see also
Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 21 (Tex. 1994). In Moriel, the supreme court
reiterated that gross negligence is comprised of objective and subjective elements. Moriel, 879
S.W.2d at 21-22. Objectively, a defendant's acts or omissions must present an "extreme degree
of risk"; subjectively, a "defendant must have an actual awareness of the extreme risk created by
his or her conduct." Id. at 22; see also Wal-Mart Stores, Inc. v. Alexander, 868 S.W.2d 322, 327
(Tex. 1993). Therefore, under the gross-negligence definition, appellants cannot be liable for
exemplary damages unless a preponderance of the evidence showed that their acts or omissions
posed an extreme degree of risk to Robinson and that appellants actually knew of such risk. (2) 
Because of the difficulty of producing direct evidence of a defendant's mental state, circumstantial
evidence may be used to prove the defendant's knowledge of an extreme risk. Moriel, 879
S.W.2d at 23 (reaffirming Williams v. Steves Indus., Inc., 699 S.W.2d 570, 574 (Tex. 1985)). 
If the evidence is sufficient to show appellants knew their acts or omissions were likely to cause
serious harm, but nevertheless continued in their course of conduct in conscious indifference to
Robinson's rights, safety, and welfare, the punitive damages award must be affirmed. See Moriel,
879 S.W.2d at 23. 

 We are constrained in reviewing no-evidence points to consider only the evidence
and inferences that tend to support the findings and disregard all the evidence and inferences to
the contrary. Havner v. E-Z Mart Stores, Inc., 825 S.W.2d 456, 458 (Tex. 1992); Garza v.
Alviar, 395 S.W.2d 821, 823 (Tex. 1965). See generally William Powers, Jr. & Jack Ratliff,
Another Look at "No Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515 (1991). If there
is any evidence to support the finding the point must be overruled and the finding upheld. In re
King's Estate, 244 S.W.2d 660, 661 (Tex. 1951). We shall summarize such supporting evidence.

 One of Robinson's primary complaints was that the Arbor was insufficiently staffed
and therefore could not adequately care for residents. The evidence supporting the judgment
shows that several nurses complained the facility was insufficiently staffed. Donna Carter, a
licensed vocational nurse at the Arbor from 1991 until December 1992, testified there would be
typically three or four staff members caring for 100 to 120 residents during the night shift. After
attending to her nursing duties, Carter and the other staff members did not have enough time to
answer the residents' call lights which indicated a patient required assistance. Patients often
complained that it took more than an hour for staff to answer their call lights. Although the
nurses and staff were supposed to make four rounds during each eight-hour shift, they often had
time to make only two or three rounds. Incontinent residents were, as a result, required
sometimes to sit or lie in their own urine and feces for up to two hours. Carter told Mary Batton,
the Director of Nurses, that she was afraid of losing her nursing license because there was not
enough staff to care for the residents. Carter also stated that Batton would forewarn the Arbor
employees when a Texas Department of Health ("TDH") inspection was due and that employees
were only allowed to work overtime when the health inspectors' visits were imminent. When
Carter asked to work overtime after an inspection, Batton and Shelley Thomas, administrator of
the Arbor, told Carter she could not because the facility was "over-budget."

 Cynthia Jones, a nurse at the Arbor from May 1992 through April 1993, stated that
when she complained about inadequate staffing she was told that even further staff cuts were
necessary because "corporate" thought the Arbor was spending too much money on staff. Barbara
Johnson, who worked as a nurse and as part of management from 1990 until 1993, stated that
Thomas informed her that "corporate" was pressuring management to further reduce the staff and
number of overtime hours worked; however, management was not to mention this to staff
members.

 In addition to inadequate staffing, Robinson complained of improper nursing care. 
Robinson's medical charts showed she never received two successive treatments prescribed by Dr.
George Robison, the Arbor's medical director, for a skin rash he attributed to scabies. (3) Nurses
Carter and Cynthia Stewart Bell testified that Robinson continually "clawed" at herself because
of the constant itching caused by the rash. Shortly after leaving the Arbor in February 1993,
Robinson was again diagnosed with scabies. She received appropriate treatment and her skin rash
quickly disappeared.

 Edith McIlvain and Dyanna Robinson, Robinson's relatives, stated they frequently
found Robinson soaked with urine and with dried feces on her body and on the walls of her
bedroom and bathroom. It appeared to them that the dried feces were not the result of a recent
incident but had been there a long time. A TDH inspection survey dated February 10, 1993,
supported their claims of a want of sanitation. The survey stated that Robinson's room had a
"pervasive urine odor." (4)

 The jury's finding of gross negligence is also supported by evidence of Robinson's
frequent falls and attempts to escape. The Arbor was aware of the problem and had discussed it
in Robinson's "care plan" meetings. Robinson had fallen thirty times and escaped the facility
eleven times in the eight-month period before she was removed from the Arbor. One escape
occurred on October 21, 1992, when Robinson left The Arbor unnoticed and wheeled herself
down Duval Road to a hamburger restaurant located at the intersection of Highway 183 and Duval
Road. Robinson was returned to the Arbor before Marjorie Townsend, the nurse in charge of her
care, realized she was missing. 

 Robinson's last escape from the Arbor occurred on February 2, 1993. Robinson
left the facility in her wheelchair and fell down a flight of concrete steps. Ella Atwood, while
visiting her mother at the Arbor, found Robinson lying on a concrete sidewalk at the bottom of
the steps with a pool of blood around her head. Atwood sent her grandson inside the facility to
inform the nursing staff that one of the residents had been injured. The door through which
Robinson left was equipped with an alarm that sounded when the door opened. The alarm may
only be turned off with a key available solely to supervisory employees. Someone turning off the
alarm would have been able to see Robinson lying on the sidewalk if they had opened the door,
before turning off the alarm, to make sure no one had escaped from the building. 

 We conclude the foregoing evidence is legally sufficient to support the jury's
finding of gross negligence. Evidence of insufficient staffing, inadequate hygiene, and inadequate
supervision constituted an extreme degree of risk to Robinson's health, safety, and welfare. The
evidence also showed the Arbor was aware of the extreme risk created by their conduct. 
Appellants concede they were aware of Robinson's propensity for accidents, i.e., falls and
wandering. They dispute, however, that they were consciously indifferent to this risk. Evidence
showing that the Arbor failed consistently to maintain sanitation, to supply a prescribed treatment,
to secure Robinson's person by preventing her escapes, and to determine whether any patient had
escaped after being alerted by the door alarm on February 2, 1993, was in our view legally
sufficient evidence of conscious indifference. We overrule appellants' legal-sufficiency challenge.

 In reviewing the evidence for factual insufficiency, we must consider the entire
record and analyze the evidence in support of and against the judgment. Pool v. Ford Motor Co.,
715 S.W.2d 629, 635 (Tex. 1986). We may not substitute our own judgment for the jury's, but
must "determine whether the evidence is so one-sided that the verdict will not be allowed to
stand." Powers & Ratliff, supra, at 525. We may set aside the judgment "only if it is so contrary
to the overwhelming weight of the evidence as to be clearly wrong and unjust." Cain v. Bain,
709 S.W.2d 175, 176 (Tex. 1986); see also In re King's Estate, 244 S.W.2d at 661.

 In addition to the evidence discussed above in support of the trial court's judgment,
the record reveals the following. Quarterly care-plan meetings were conducted to discuss
Robinson's needs and treatments. These meetings were attended by a dietician, nurse, social
worker, recreational director, and Robinson's physician. Robinson's family members were
invited to participate. Solutions proposed at these meetings included closer supervision by the
staff, use of a "wanderguard," (5) use of an alarm system on other doors, and further use of
Robinson's call light. However, Robinson's daughter stated the care-plan meetings were only a
"paper exercise" to satisfy state licensing requirements; the meetings had no resulting effect on
Robinson's care and treatment.

 A staff member suggested that Robinson be moved to a room closer to the nurses'
station. Robinson's family rejected this suggestion, however, because Robinson's roommate
looked after Robinson and "screamed and hollered" to get the staff's attention when Robinson
needed help. Robinson's daughter also stated she mistakenly thought the proposed new room was
about the same distance away from the nurses' station as Robinson's old room.

 Townsend, the charge nurse on February 2, 1993, the day of Robinson's last
escape, testified she did not remember hearing the alarm sound before Atwood's grandson
informed her of Robinson's accident, did not deactivate the alarm, and did not know of any other
charge nurse on duty who turned off the door alarm. Kyle Arthur, a nurse's aide, testified he
heard the alarm sounding approximately fifteen minutes after he saw Robinson leave the dining
room. Arthur testified further, however, that the staff had already gone to help Robinson when
he first heard the alarm and the alarm may have been triggered by a staff member going outside
to help after Atwood's grandson informed the Arbor of Robinson's injuries. 

 The evidence also showed that the Arbor dedicated approximately 2.8 hours of
nursing care per patient per day--a figure higher than the industry average of 2.3 hours. (6) Cynthia
Stewart, a nurse's aide, and nurse Townsend testified that the Arbor was always fully staffed. 
TDH recommends that nursing home rounds be made at least every two hours; however, Mary
Batton, the Arbor's director of nurses, encouraged her staff to "round" every hour to one and one-half hours whenever possible. As previously discussed, nurse Carter stated she frequently only
had time to make two or three rounds in an eight-hour period. 

 Appellants, in support of their position that Robinson received proper nursing care,
assert that Robinson did not suffer from skin breakdown due to incontinence. Robinson did suffer
from a small stage-two (skin involvement only) pressure sore that healed in about two weeks. Dr.
Ivo Abraham, appellants' expert witness, testified that the fact that the pressure sore healed
quickly showed in his opinion that Robinson received good nursing care.

 Theresa de Venecia Centeno, a TDH employee who investigated Robinson's
February 2, 1993 accident, interviewed eight residents and found the facility to be clean. De
Venecia Centeno also testified that she had previously cited The Arbor for health violations. She
further stated that she "did not find the facility negligent at that time within the scope that I looked
at." Dr. Robison also testified he believed the Arbor rendered proper care and was not negligent.

 Appellants also point out that they recruited and hired qualified people, such as
Thomas and Batton, to correct deficiencies found by TDH in 1989 inspections. Batton's tenure
coincided with an increase in the number of staff members and in the budget. Additionally, the
number of nursing hours per patient per day was increased from 2.5 to 2.8. Through appellants'
efforts, the Arbor's record with the TDH improved and the facility was not cited for insufficient
staff in 1992.

 With regard to Robinson's allegations of improper treatment, appellants introduced
evidence that Robinson's roommate was given the scabies treatment and that customarily the
Arbor administered scabies treatments to roommates at the same time. In purported contradiction
to testimony that Robinson was constantly scratching her skin rash, appellants argue that
Robinson's medical chart showed only eight entries of itching complaints in five and one-half
months. Dr. Bennett, Robinson's physician after she left the Arbor, successfully treated
Robinson's skin rash with Kwell, a scabies medication, but he simultaneously eliminated her
blood-pressure medicine. Although Dr. Bennett testified he believed the rash to be scabies, he
could not rule out completely the possibility that the rash had been caused by the blood-pressure
medicine.

 Taking into account the whole of the evidence, we cannot conclude the jury's
verdict was so contrary to the overwhelming weight of the evidence as to be manifestly unjust. 
Cain, 709 S.W.2d at 176; In re King's Estate, 244 S.W.2d at 661.In addition to evidence that a
staff member turned off the door alarm without checking to see if anyone needed assistance, the
facility did not assure that Robinson had received her prescribed scabies treatments even though
the staff knew she was constantly suffering from the rash. The evidence further showed, if
believed, that the Arbor manipulated the number of staff on hand depending on whether a health
inspection was imminent. Robinson's numerous escapes were undisputed--eleven escapes in eight
months is a lot. We overrule appellants' first point of error.

 In their second point of error, appellants complain the trial court committed
reversible error by allowing Robinson to refer to the net worth of Beverly Enterprises, Inc., a
corporation not named as a defendant, when no evidence was admitted regarding its net worth. 
Robinson's counsel referred to the net worth of Beverly Enterprises, Inc. six times throughout
trial, arguing that because Beverly Enterprises-Texas, Inc. and Beverly California Corporation
are wholly owned subsidiaries of Beverly Enterprises, Inc., the net worth of Beverly Enterprises,
Inc. was relevant to the issue of exemplary damages. Robinson asserts appellants waived the
error, if any, by failing to object consistently and in a timely fashion and invited error through
their own argument. See Chevron U.S.A. Inc. v. Lara, 786 S.W.2d 48, 51-52 (Tex. App.--El Paso
1990, writ denied) (error waived if evidence comes in without objection even though objection
to similar question was previously made); Southwest Inns, Ltd. v. General Elec. Co., 744 S.W.2d
258, 266 (Tex. App.--Houston [14th Dist.] 1987, writ denied) ("Appellants are in no position to
complain of the action of the court in overruling their objection to argument when similar
argument was made to which there was no objection."). We agree error was waived.

 One instance of waiver occurred upon redirect examination of McIlvain:



[Q]: Is it your position in this case that a corporation with a net worth of $600
million ought to be able to provide more staff to take care of their patients?


[A]: Yes.


[Robinson's counsel]: I'll pass the witness.


[Appellants' counsel]: I don't have anything else.


[The court]: All right. You may step down, ma'am.



 The judge then dismissed the jury for morning recess at which time appellants'
counsel objected stating, "I didn't get my objection in this time, but I don't think that's proper." 
Ordinarily, an objection is untimely if it is made after the answer is given. Top Value Enters.,
Inc. v. Carlson Mktg. Group, Inc., 703 S.W.2d 806, 811 (Tex. App.--El Paso 1986, writ ref'd
n.r.e.). The court sustained appellants' objection on the grounds that the question was not stated
in proper form because counsel did not ask the witness to assume a net worth of $600 million, and
reserved for later the question of whether the net worth of the parent corporation was admissible. 
No motion to strike was made. See Poole v. State Highway Dep't, 256 S.W.2d 168, 171 (Tex.
Civ. App.--Fort Worth 1953, writ dism'd) (jurors may consider testimony until party moves to
strike). Appellants did not obtain a ruling on what they now complain of on appeal. 

 Timely objections were made to three references to net worth. Appellants point
to several cases for the proposition that once an objection is made, subsequent objections are
unnecessary to preserve error. Atkinson Gas Co. v. Albrecht, 878 S.W.2d 236 (Tex.
App.--Corpus Christi 1994, writ denied), states the general rule that "prior or subsequent
presentation of essentially the same evidence without objection waives error." Id. at 242. 
However, the court also states that a party is "entitled to assume that the judge will make the same
ruling as to other offers of similar evidence" and therefore repeating the objection is not always
necessary. Id. (citing D.L.N. v. State, 590 S.W.2d 820, 823 (Tex. Civ. App.--Dallas 1979, no
writ); Price v. Gulf Atl. Life Ins. Co., 621 S.W.2d 185, 188 (Tex. Civ. App.--Texarkana 1981,
writ ref'd n.r.e.); Estate of Brown v. MASCO Corp., 576 S.W.2d 105, 107 (Tex. Civ.
App.--Beaumont 1978, writ ref'd n.r.e.); Crispi v. Emmott, 337 S.W.2d 314, 318 (Tex. Civ.
App.--Houston 1960, no writ)). 

 The Albrecht court concluded that the determination of the sufficiency of a previous
objection to encompass a subsequent offer of similar evidence must be made on a case-by-case
basis after considering the following factors: (1) the proximity of the objection to the subsequent
testimony, (2) which party solicited the subsequent testimony, (3) the nature and similarity of the
subsequent testimony as compared to the prior testimony and objection, (4) whether the testimony
has been elicited from the same witness, (5) whether a running objection has been requested or
granted, and (6) any other circumstances that might suggest why the objection should not have to
be reurged. Albrecht, 878 S.W.2d at 243.

 Based on the foregoing factors, we conclude error was waived during the evidence
portion of the trial and closing argument. The cases holding that a party making a proper
objection to the introduction of testimony, which objection is overruled, may assume the judge
will make a similar ruling to an offer of similar evidence, thus obviating the need for counsel to
repeat the objection, are limited primarily to instances where similar evidence is elicited
immediately from the same witness or where the judge expressly grants a running objection. City
of Fort Worth v. Holland, 748 S.W.2d 112, 113 (Tex. App.--Fort Worth 1988, writ denied). In
the present case, defense counsel failed to make a timely objection to McIlvain's testimony
regarding net worth. No running objection was requested by counsel, no similar objection was
previously made to McIlvain's testimony, and McIlvain's testimony was not close in proximity
to a previous objection. All of these factors weigh in favor of the general rule that timely
objections must be made to preserve error.

 Appellants' argument of prejudice is further diminished by their counsel's reference
to the net worth of Beverly Enterprises, Inc. in his own final argument:



[T]hey want to create the image of some big, profit corporation sucking up profits
out of a nursing home, and not providing enough staff to take care of the residents,
which is absolutely false. There is no evidence of understaffing for profit at all. 
All the evidence, in fact, is to the contrary. During 1989, 1990, and 1991 this
facility lost over a million dollars a year. . . . They're currently losing $30,000
a month out there, $360,000 a year. If this corporation was out for profit only,
they would have closed this facility years ago. . . . There is no evidence of any
corporate profit taking at all. These figures thrown around have to do with a
corporation that's not even a defendant in this case. And also notice that he
mention assets. He doesn't talk about losses. There's no profit/loss statement in
evidence. If their other facilities perform like this one in terms of profit and loss,
they don't make much money.



 Finally, Robinson's counsel in closing argument rebutted appellants' statement that
the $593 million dollar figure did not include losses:

[Robinson's counsel]: He says that the $593 million figure is assets only and that's
unfair. Folks, that's net worth.


[Appellants' counsel]: Your Honor, I'm going to object. That's not in evidence.


[Robinson's counsel]: I'm sorry, Your Honor, I believe it is in evidence, and I'm
entitled to argue what net worth is since he said what he thought it is.


[Appellants' counsel]: It's not even a corporation in this case and that figure is not
in evidence.


[The court]: The objection is overruled.


[Robinson's counsel]: Net worth, folks, that should pile up all your assets on one
side and you pile up all your liabilities on the other side and the difference between
the two is $593 million. Okay. Some of us may have some assets, but when you
look at our net worth, it's [sic] pretty well zippity doo dah. But these folks have
$593 million more in assets than they do in liabilities, not what [Appellants'
counsel] was trying to tell you.



The rebuttal to appellants' counsel's statement that the net worth figure referred only to assets was
invited and was not harmful. See Texas Gen. Indem. Co. v. Moreno, 638 S.W.2d 908, 913 (Tex.
App.--Houston [1st Dist.] 1982, no writ).

 With regard to improper jury arguments, an appellant must prove:



(1) an error (2) that was not invited or provoked, (3) that was preserved by the
proper trial predicate, such as an objection, a motion to instruct, or a motion for
mistrial, and (4) that was not curable by an instruction, a prompt withdrawal of the
statement, or a reprimand by the judge.



3 Texas Civil Practice § 23.23, at 357 (Diane M. Allen et al. eds. 1992 ed.) (quoting Standard
Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839 (Tex. 1979)). 

 Moreover, even if error had been properly preserved, we do not believe "the error
complained of amounted to such a denial of the rights of the appellant as was reasonably
calculated to cause and probably did cause rendition of an improper judgment." Tex. R. App. P.
81. The harmless-error discussion in Hoechst Celanese Corp. v. Arthur Bros., Inc., 882 S.W.2d
917, 930 (Tex. App.--Corpus Christi 1994, writ denied), is instructive. As in Hoechst, there is
no indication that the net-worth references affected the jury. The jury had heard evidence
regarding Beverly Enterprises, Inc.'s size and wealth including testimony that: Beverly
Enterprises, Inc. owned 850 nursing homes in the United States, 121 of which were in Texas, and
had lost over a million dollars a year in 1989, 1990, and 1991. Furthermore, the jury only
awarded $240,000 in punitive damages instead of the $700,000 requested by Robinson. We
conclude any error resulting from Robinson's references to the net worth of Beverly Enterprises,
Inc. was harmless. We overrule appellants' second point of error and affirm the trial-court
judgment.



 

 John Powers, Justice

Before Justices Powers, Jones and B. A. Smith

Affirmed

Filed: August 16, 1995

Do Not Publish

1.   Beverly Enterprises, Inc., a corporation not named as a defendant in this case,
apparently controls Beverly California Corporation.
2.   The supreme court in Moriel expressly declined to adopt a "clear and convincing
evidence" standard for punitive damages, adhering instead to the preponderance of the
evidence standard. 879 S.W.2d at 32.
3.   Scabies is a transmissible parasitic skin infection caused by impregnated mites that
burrow under the skin and deposit their eggs. The larvae hatch within a few days and
congregate around hair follicles. Symptoms include severe skin irritation and intense
itching. Treatment entails applying a topical lotion, such as "Kwell," all over the body
and leaving it there overnight. In addition, the patient's room and clothing must be
disinfected to prevent recurrence.


 Dr. Robison's first test for scabies was negative; however, it is common for tests to
be negative even though a patient has scabies. Initially Dr. Robison believed Robinson
had scabies; however, he changed his diagnosis when she did not improve after he
prescribed Kwell lotion. He was unaware that the prescribed medication apparently had not
been administered.
4.   Appellants point out that the TDH is required to conduct inspection surveys of
nursing homes that participate in the Medical Assistance Program pursuant to licensing
standards promulgated in the Administrative Code. See 40 Tex. Admin. Code §§ 19.1-.2107 (1995). Section 19.1(b)(1) provides as follows:


These requirements provide the nursing facility with information necessary to
fulfill its vendor contract for participation with [the Texas Department of Human
Services]. Each facility is required to keep these requirements current. The
requirements are the basis for surveys by federal and state surveyors, are part of
the vendor contract, and are necessary for the facility to remain in compliance
with federal and state laws.


Id. § 19.1(b)(1). 


 Appellants assert that because these state regulations impose contractual duties on
nursing facilities, and are not intended to create a tort duty between the nursing facility and the
individual patient, the inspection surveys are irrelevant for the purposes of this suit. We
disagree. Inspection reports introduced into evidence are relevant in conducting a sufficiency-of-the-evidence review, not as to the existence of a duty but as to the breach of a duty of care
having a common-law origin.
5.   A wanderguard is a device which activates an alarm when the patient attempts to leave
the facility. Robinson's wanderguard would only activate when she left the front door. 
6.   Adherence to industry standards is only one factor to consider in a negligence
determination; such evidence does not conclusively establish that the health-care provider
fulfilled its duty of care, nor does it preclude a finding of negligence. Hernandez v. Nueces
County Medical Soc'y Community Blood Bank, 779 S.W.2d 867, 871 (Tex. App.--Corpus
Christi 1989, no writ).