FISHER CONTROLS INTERNATIONAL, INC., Appellant,

v.

Bill GIBBONS, Appellee.

No. 01–94–0009–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 19, 1995.

---

Thomas G. Gee, Jane Nenninger, Margaret N. McGann, Houston, Robert A. Hall, Elizabeth B. Kamin, Woodard M. Carstarphen, Houston, for Appellant.

Guy E. Matthews, Houston, Gerald H. Buttrill, Andrew L. Jefferson, Houston, for Appellee.

Before COHEN, MIRABAL and TAFT, JJ.

## OPINION

COHEN, Justice.

Bill Gibbons sued Fisher Controls International, Inc. (Fisher) asserting tort claims arising from his purchase of a corporation that was Fisher's independent sales representative in Alaska. His fraud and Deceptive Trade Practice Act claims were submitted to a jury, which found in his favor on both; the trial court granted Fisher's motion for j.n.o.v. on the DTPA claim only. The trial court rendered judgment for Gibbons for approximately $4.62 million, including $3.3 million in punitive damages. We re-

verse and render judgment that Gibbons take nothing.

Fisher sells valves and instruments through independent sales companies throughout North America. Fisher's standard representative agreement provides for a one year term.

Gibbons earned college degrees in mechanical engineering and business and then went to work for Fisher. In 1974, he left and became a sales engineer in Houston for Puffer–Sweiven, Inc., Fisher's largest independent sales representative. Gibbons was still employed in that capacity when, in late 1984, Bill Johnson—the president and owner of Alaska Controls, Inc. (ACI), the Fisher representative in northern Alaska—decided to retire at the expiration of ACI's representative agreement with Fisher. Johnson requested that Fisher help find a buyer for ACI. Hal Tompkins, the president of Puffer–Sweiven, approached Gibbons about it in November, and arranged for Gibbons to meet with Fisher's agents, Jack Carey and John Weekley. The deal Gibbons and Johnson negotiated called for Gibbons to pay a portion of the purchase price for ACI in cash, and the balance by a note to Johnson secured by ACI stock, payable over a five-year period.

Because the note to Johnson was for five years, Gibbons proposed to Fisher that its representative agreement with ACI be renewed to extend for five years, rather than for the typical one year term. Fisher refused. Ultimately, Fisher and ACI signed a three year contract. With that one exception, the agreement Fisher and Gibbons, acting as ACI's president, signed on April 1, 1985, was the typical form contract for Fisher's sales representatives.

Gibbons embarked upon an ambitious effort to expand ACI's business in Alaska. That effort initially enjoyed a degree of success in 1985; although ACI's costs and expenses had increased dramatically, sales revenues had also greatly increased. Late that year and in early 1986, however, oil prices dropped from approximately $32 a barrel to approximately $12 a barrel. ACI's business suffered a commensurate decline; over 90 percent was oil-related. ACI's condition worsened during the rest of 1986 and 1987.

By letter dated January 25, 1988, Fisher notified ACI that it would not renew ACI's sales representative agreement when it expired on March 31, 1988. Fisher and Gibbons thereafter agreed that ACI would continue to be a representative for an additional four months. On June 23, 1988, Fisher terminated that agreement and stated the following reasons: (1) a bank had seized most of ACI's assets, and was going to sell them; (2) ACI no longer had offices, phones, facilities, or employees to conduct its business or service the needs of customers owning Fisher products; (3) ACI had told customers that Fisher products re-manufactured by a third party were new and unused Fisher products; (4) sales had "decreased tremendously" and customer complaints had increased; and (5) ACI owed Fisher $200,000, which was past due.

Fisher later signed a representative agreement with a new company. Gibbons sold what was left of ACI to third parties and returned to Texas. This suit followed, in June 1990.

■ We first address Gibbons' cross-point of error, in which he contends the trial court erred in granting Fisher's motion for j.n.o.v. and setting aside the jury's verdict on his DTPA claim.

■ To recover under the DTPA, one must be a "consumer," which means the claimant must have sought or acquired goods or services by purchase or lease, and must show that these same goods or services formed the basis for the DTPA complaint. *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351–52 (Tex.1987); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981). The DTPA defines "goods" as "tangible chattels or real property purchased for use," and it defines services as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." TEX.BUS. & COM.CODE ANN. § 17.45(1)(2) (Vernon 1987). The DTPA excludes those transactions that convey wholly intangible property rights. *Texas Cookie Co. v. Hendricks & Peralta,*

747 S.W.2d 873, 876 (Tex.App.—Corpus Christi 1988, writ denied). *See also Meineke Discount Muffler v. Jaynes,* 999 F.2d 120, 125 (5th Cir.1993). The question of whether a plaintiff is a consumer under the DTPA is a question of law for the trial court. *Holland Mortgage & Inv. Corp. v. Bone,* 751 S.W.2d 515, 517 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

■ ACI purchased an intangible property right, to wit, the right to act as Fisher's sales representative under the "Representative Agreement." The purchaser of such an intangible business right is usually not a "consumer" under the DTPA, unless qualifying "collateral services" are an *objective of the transaction* and not merely incidental to the purchase. *Texas Cookie Co.,* 747 S.W.2d at 876–77. In other words, the goods or services acquired must form the basis of the DTPA claim. *Cameron,* 618 S.W.2d at 539.

In the present case, ACI did not purchase a "franchise," with typical associated collateral services, such as is described in *Texas Cookie Co.,* 747 S.W.2d at 877. Rather, ACI merely contracted to be a "sales, engineering and service representative" for Fisher products in Alaska. ACI did not pay a franchise fee, or any other type of fee, for this representation right. ACI was to solicit orders for Fisher products, transmit the orders to Fisher, and receive a commission when the customer paid Fisher. ACI could also buy Fisher products at a discount and resell them on its own behalf. At ACI's expense, it could attend training sessions provided by Fisher, if ACI deemed it appropriate. ACI specifically agreed, in connection with its performance under the "Representative Agreement," that it would not "describe itself other than as a sales representative of the Fisher Companies."

We hold, as a matter of law, that the few "collateral services" Fisher agreed to provide ACI under the contract were merely *inciden-*

*tal* to the transaction, rather than being *an objective* of the transaction. Therefor, ACI is not a "consumer" under the DTPA with regard to the claims asserted as to the "Representative Agreement."[1] *See Johnson v. Walker,* 824 S.W.2d 184, 187 (Tex.App.—Fort Worth 1991, writ denied) (plaintiff was not a DTPA consumer because his agreement to become an insurance sales agent did not involve purchase of goods and services, but merely the intangible right to sell the defendant's products); *Nelson v. Data Terminal Sys., Inc.,* 762 S.W.2d 744, 747 (Tex.App.— San Antonio 1988, writ denied); *Cameron,* 618 S.W.2d at 539; *Meineke,* 999 F.2d at 125.

■ Further, even if ACI was a "consumer" under the DTPA, this does not make Gibbons, individually, a "consumer." Gibbons merely signed the "Representative Agreement" as President of ACI, a corporation. *See Crossland v. Canteen Corp.,* 711 F.2d 714, 720–21 (5th Cir.1983) (where principal shareholder of a corporation negotiated for and signed a franchise agreement in his individual capacity and immediately assigned it to his corporation and the corporation paid all consideration for the franchise, the individual shareholder did not "purchase" the franchise and the franchise was not a "good" or "service" under the DTPA; therefore the shareholder was not a "consumer" entitled to bring suit.).

We believe the present case is distinguishable from authorities relied on by Gibbons, such as *United Postage Corp. v. Kammeyer,* 581 S.W.2d 716 (Tex.Civ.App.—Dallas 1979, no writ), and *Wheeler v. Box,* 671 S.W.2d 75 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). In *Kammeyer,* the goods acquired, stamp vending machines, were the subject of the misrepresentations, and those misrepresentations were the basis for the claim. 581 S.W.2d at 721. In *Wheeler,* the business purchased included both tangible personal property and specific services, such as the promise to pro-

---

1. We note that Gibbons does not complain about the quality of the Fisher products to be sold under the agreement. Rather, he complains (1) that Fisher falsely told him that the representative agreement would be extended beyond three years, (2) that Fisher falsely promised 180–day credit terms throughout the contract, (3) that Fisher failed to inform him of its long term

business plan to do away with independent representatives like ACI, and (4) that Fisher failed to tell him that he was the "23rd person in line" for the position of Fisher representative in Alaska. These are all complaints dealing with ACI's acquisition of the intangible business right to be a Fisher sales representative.

vide at least 10 days of training, and the failure to provide these services was the basis of the claim. 671 S.W.2d at 77–78.

We hold the trial court did not err in ruling, as a matter of law, that Gibbons was not a consumer. Gibbons' cross-point of error is overruled.

In points of error three and four, Fisher asserts that the evidence is legally and factually insufficient to support the jury's finding of fraud. In reviewing legal sufficiency, we consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988). In reviewing factual insufficiency, we consider all the evidence and sustain the point only if the evidence is so weak or so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

The elements of fraud are (1) that the defendant made a material representation; (2) that was false; (3) that the defendant knew it was false when made; (4) that the defendant intended the plaintiff to act upon it; (5) that the plaintiff acted in reliance upon it; and (6) thereby suffered injury. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). When circumstances impose a duty to speak and one deliberately remains silent, the silence is equivalent to a false representation. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986).

Gibbons claims four acts of fraud by Fisher: (1) that Fisher told Gibbons, before he signed the agreement between ACI and Fisher, that Fisher would later extend the agreement beyond three years; (2) that Fisher misrepresented the credit terms it would extend to ACI; (3) that Fisher failed to inform Gibbons of a report generated by an outside consulting firm and provided to Fisher two months before the execution of the representative agreement with ACI; and (4) that Fisher failed to tell Gibbons that he was the "23rd person in line" for the position of Fisher representative in Alaska.

### Fisher's representations.

### First representation: length of the contract.

Gibbons testified that when he expressed his misgivings about the proposed three-year term of the representative agreement, Carey and Weekley told him, "If you sell your quota or your goals every year, you are going to have it [your position as a Fisher representative] until you get Mr. Johnson paid off." Gibbons further described the conversation as follows: "I said, John—Weekley, we're dealing with—John, what are you not telling me about this thing? Something doesn't sound like you're coming clean. I'm giving up everything. [He] [s]aid you got a going Jenny. It's a mere formality. Trust me." Gibbons testified to the same kind of representation made by Carey, as well; he said that Carey told him that the three years was "nothing more than mere formality" and that it had "never happened before in Fisher's history that anybody has been terminated until the other party had paid off the previous owner, and he said just go with us and we'll talk about it later." Finally, Gibbons also testified that, as Weekley had asked, he put his trust in Jack Carey and John Weekley.

Weekley testified that Fisher had "a duty and obligation to deal fairly and in good faith" with its representatives; to tell the truth in those dealings; and to disclose and not hide material facts. He also testified that the written representative agreement between Fisher and Gibbons did not encompass the whole agreement between them; it was supplemented, he agreed, by the relationship between the two parties and their obligation to deal with each other in good faith.

Mr. Lipstet, the attorney who represented Gibbons in his negotiations with Fisher, testified that he did not remember Weekley or Carey using the exact words, "mere formality" at a particular meeting. He testified, however, that, "It was indicated clearly to me and to Mr. Gibbons at that meeting that there would be no problem in regard to any of these matters that I discussed, the inventory, the renewal, the term[.]" He also testi-

fied that, as an attorney, he understood that a contract is not a "mere formality."

Gibbons admitted that he knew of and understood the renewal provisions in the contract when he signed it. Gibbons also testified that after he rejected a one-year contract, Fisher told him that a three-year term was "the best we can do." He stated that when Fisher mailed out the contract, "They mailed me a one year contract, and I picked up the phone and I said what in the world is going on? This is a one year contract. That's not what we agreed to.... Said, well, let me redo it. Somebody made a mistake. I said okay. We'll—let's get it cleaned up because I've just cashed out and started over and this is pretty serious stuff and you are not treating me that way."

We hold that Gibbons cannot recover for misrepresentations concerning the length of the agreement. Gibbons was represented by counsel in negotiating his contract, and he was experienced in business and in this industry. As ACI's agent, he knowingly agreed to a three year term in the following unambiguous language:

VII. Term

A. This Agreement shall be effective for a period of 3 years from the date set forth & will automatically terminate unless specifically renewed upon the further written agreement of Fisher and the Representative....

D. Nothing contained herein shall be deemed to create any express or implied obligation on either party to renew or extend this Agreement or, if Representative is continued or renewed as a Fisher representative, to create any right to continue such relationship on the same terms and conditions contained herein. Each party, in its sole discretion, shall have the right to determine, for any reason whatsoever, not to renew, continue or extend this Agreement or to continue such relationship on the terms and conditions contained herein....

E. Neither party, by reason of the termination or non-renewal of this Agreement, shall be liable to the other for compensation, reimbursement or damages because of the loss of anticipated sales or prospective profits or because of expenditures, investments, leases, property improvements or other matters related to the business or goodwill of the parties. Except as provided in Section VII, there shall be no other payments of any kind or nature due to or made to the Representative upon the cancellation or termination of this Agreement, notwithstanding any investment or expenditures incurred by the Representative in order to facilitate the sale of Products, including services, hereunder.

XI. Governing law, entire agreement

... This agreement constitutes the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement. This Agreement cancels and supersedes all existing contracts and arrangements by and between Fisher, the Fisher Companies and the Representative for the representation of the Fisher Companies. Except as specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms and conditions of this Agreement shall be binding unless hereafter made in writing and signed by the party to be bound....

Gibbons does not contend that Fisher misrepresented to him the terms of the contract. Rather, he relies on statements made to him before he signed the contract. Plainly, Gibbons could not bring this claim as a breach of contract. Even if he were a party to the contract, evidence of the misrepresentation would be barred by the parol evidence rule. *Town North Nat. Bank of Broaddus*, 569 S.W.2d 489, 492 (Tex.1978). Gibbons testified that he had read and understood the renewal provisions in the contract; that he had tried but failed to get Fisher to agree to a five-year term; that his attorney had advised him a three-year term was less than he needed if he was signing a five-year note; and that contrary to the attorney's advice, he accepted a three-year term.

■ Negotiations preceding a written contract should not displace the terms of the

written contract. *Boggan v. Data Sys. Network Corp.*, 969 F.2d 149, 153–54 (5th Cir. 1992) (Texas law). When experienced executives represented by counsel voluntarily sign a contract whose terms they know, they should not be allowed to claim fraud in any earlier oral statement inconsistent with a specific contract provision. *Id.; Accord Airborne Freight Corp. v. C.R. Lee Enter., Inc.*, 847 S.W.2d 289, 297 (Tex.App.—El Paso 1992, writ denied) (written contract vitiated any reliance on oral promises). Otherwise, contracts would be "nothing more than a scrap of paper." *Howeth v. Davenport*, 311 S.W.2d 480, 482 (Tex.Civ.App.—San Antonio 1958, writ ref'd n.r.e.). For a clear and convincing discussion of this principle in a case with similar facts, *see Turner v. Johnson & Johnson*, 809 F.2d 90, 95–98 (1st Cir. 1986). *See also Allied Bank of Texas v. Plaza DeVille Assoc.*, 733 S.W.2d 566, 570–71 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.).

This is not a case like *Wagner v. Morris*, 658 S.W.2d 230 (Tex.App.—Houston [1st Dist.], 1983, no writ), on which Gibbons relies. In that case, homebuyers recovered against their seller for misrepresenting the interest rate of an assumed mortgage as 9⅞% when it was really 10.5%. They were allowed to recover "since neither the deed nor the deed of trust charged the [buyers], as a matter of law, with knowledge of the true facts of the matter they contend was represented." *Id.* at 234 (Evans, C.J., concurring). In contrast, the contract here does charge Mr. Gibbons, as a matter of law, with knowledge of the true facts that he contends were misrepresented. In *Wagner*, the plaintiffs never saw the note, and the contract documents they saw did not state the interest rate. *Id.* at 233. The opposite is the case here. In *Wagner*, the plaintiffs did not seek to change the terms or avoid the obligations under their promissory note. *Id.* at 232. Here, Mr. Gibbons seeks to avoid the contract he signed, which clearly sets a three-year term that terminates "automatically," expressly denies any obligation to renew, allows non-renewal "for any reason whatsoever," and gives up his right to seek damages for termination or non-renewal of the contract.

Nor is this case like *Hoechst Celanese Corp v. Arthur Bros.*, 882 S.W.2d 917 (Tex. App.—Corpus Christi 1994, writ denied). The contract there "[did] not address renewal, extension, or new contracts." *Id.* at 924. This one does. The contract in *Hoechst* contained nothing like the provisions in section VII of this contract (quoted above). *Id.* at 921. It contained only an entire agreement and a written amendment clause, and even those are much less favorable to *Hoechst* than section VIII (quoted above) is to Fisher. As the *Hoechst* court repeatedly emphasized, the misrepresentation there was "separate from and not excluded by the contract." *Id.* at 924; "outside the boundary of the written nine-month contract," *Id.* at 924, n. 3; and "was not subsumed into or erased by the contract," *Id.* at 925. That is opposite of this case.

We conclude that Gibbons cannot recover because the law does not allow him to rely upon the oral representations preceding the written contract. Thus, he had "no right to rely" on the oral statements. *Allied Bank*, 733 S.W.2d at 571.

**Second representation: credit terms of 180 days.**

Gibbons testified that at a January 23, 1985 meeting in College Station, Weekley and he agreed to 180–day payment terms on $750,000 worth of inventory.

After that meeting, Gibbons wrote to Weekley, stating, "The following should be included as a [sic] body of the formal agreement or as an addendum, etc.: ... [Fisher] will work out extended inventory purchase for a maximum inventory of $750,000 ... for the 18 months following April 7, 1985. This is to have payment terms of net 180 days[.]" Gibbons testified that Weekley never responded to his letter before April 1, 1985, when they signed the contract. Gibbons further testified that when he went to Alaska, he thought he had an agreement for 180–day payment terms on $750,000 worth of inventory, and only after he arrived in Alaska did Fisher communicate a contrary position to him.

The contract provides:

This agreement constitutes the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement. This Agreement cancels and supersedes all existing contracts and arrangements by and between Fisher, and the Fisher Companies and the Representative for the representation of the Fisher Companies. Except as specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms and conditions of this Agreement shall be binding unless hereafter made in writing and signed by the party to be bound....

The only writing on this subject signed by Fisher rejected Gibbons' proposal. In it, Fisher agreed to 180-day terms for inventory purchased before July 1, 1985, with terms then reduced to 90 days, and finally to 45 days. This agreement was signed in 1985.

█ We conclude, as a matter of law, that Gibbons cannot recover for these alleged misrepresentations. First, any alleged oral agreement preceding the contract was cancelled by the terms of the contract, and there was no writing signed by Fisher creating any additional terms. In addition, Gibbons knew in 1985 that Fisher refused to grant 180-day credit terms for the entire three-year contract. He sued in 1990, more than four years after this alleged fraud. The statute of limitations for fraud is four years. *Buffington v. Lewis,* 834 S.W.2d 601, 603 (Tex.App.—Houston [1st Dist.] 1992, no writ). Thus, claims based on the 1985 misrepresentation of credit terms are barred by limitations.

**Third representation: failure to inform Gibbons of the Booz–Allen report.**

█ In 1984, Fisher hired consultants Booz–Allen & Hamilton (BAH) to propose a strategy for its worldwide instrumentation systems business. BAH made four recommendations to Fisher, including one to "consolidate the representative system and/or establish Fisher-run regional engineering/demo centers to enhance representative profitability." Fisher had the report two months before the ACI agreement was signed and did not inform Gibbons of that recommendation.

For several reasons, we hold that Gibbons' fraud recovery cannot be based on Fisher's failure to disclose the Booz–Allen study. First, any actions Fisher took to carry out Booz–Allen's recommendation did not, as a matter of law, injure Gibbons. We have previously held that Fisher had no duty to grant Gibbons a five-year term. Its only duty under the contract was to give him a three-year term. Fisher gave Gibbons more than a three-year term. After that time, Fisher was entitled to terminate ACI for reasons stated in the Booz–Allen study or, as stated in paragraph 7(d) of the contract, "for any reason whatsoever." Therefore, Fisher had no duty to disclose the report to Gibbons. *See O'Neal v. Burger Chef Sys., Inc.,* 860 F.2d 1341, 1350 (6th Cir.1988).

**Fourth representation: Failure to tell Gibbons that others had declined to buy ACI.**

█ Finally, Gibbons contends Fisher defrauded him by not telling him that he was the "23rd person in line" to buy ACI. Assuming that Fisher had tried and failed to convince 22 other prospects to take the Alaska territory, a fact not clearly shown in the record, we hold, as a matter of law, that Fisher had no duty to tell that to Gibbons. Gibbons cites no authority, and we cannot imagine there would be any, holding that a seller of any good, service, or contract right has a duty to tell a prospective buyer how many people have previously refused to buy the product.

We sustain points of error three and four.

The trial court's judgement is reversed, and judgment is rendered that Gibbons take nothing.