TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00434-CV







Nicholas van Bavel, Appellant


v.



Oasis Design, Inc.; David Knapp; Constantine Ciocan; and


C&C Electronics, Ltd. Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT


NO. 95-13472, HONORABLE JOSEPH HART, JUDGE PRESIDING






 Appellant Nicholas van Bavel, individually and in the right of Oasis Design, Inc.,
as a shareholder and on behalf of other shareholders similarly situated, sued appellees David
Knapp, Constantine (Coco) Ciocan, C&C Electronics, and Oasis Design, Inc. for fraud, breach
of contract, and breach of fiduciary duty. After the jury returned a verdict in favor of van Bavel,
the trial court granted appellees' motion for judgment notwithstanding the verdict and rendered
a take-nothing judgment.

 Van Bavel appeals asserting thirty-two points of error that present the following
arguments: (1) there was legally sufficient evidence to support the jury's liability finding and a
judgment based on van Bavel's claim of breach of fiduciary duty; (2) there was evidence of
damages from such breach, van Bavel was not precluded from recovering those damages as a
matter of law, and van Bavel was, as a matter of law, entitled to recover exemplary damages
based on the jury's verdict; (3) van Bavel was entitled to pursue tort remedies for fraud and
breach of fiduciary duty even though his injuries may have been economic and related to his
contract with Oasis; (4) there was legally sufficient evidence to support the jury's findings of
common-law and statutory fraud, conspiracy to commit fraud, and willful conduct supporting
exemplary damages against all appellees; (5) appellees waived any complaint about the measure
of damages for common-law and statutory fraud, there was sufficient evidence to support the
jury's award of actual and exemplary damages for appellees' fraud, and the trial court was
obligated to render judgment for those amounts; (6) van Bavel was entitled, as an alternate basis
for recovery, to the payment of $1,667,700 in return for his delivery of his stock pursuant to his
contract claim; and (7) the evidence supported the jury's findings that Knapp and Ciocan had
breached their fiduciary duty to Oasis and that Oasis had been damaged and was entitled to
exemplary damages. We will affirm in part and reverse in part.


FACTUAL AND PROCEDURAL BACKGROUND

 Van Bavel and Knapp had been co-workers at Crystal Semiconductor in Austin
when, in October 1993, they formed their own business, Oasis Design, Inc. Oasis's main
business was computer chip design and development. The enterprise was successful and grew
rapidly. Though much of the work was shared, van Bavel served officially as president of the
corporation while Knapp served as vice-president.

 Essentially from Oasis's inception, there was interest in a possible merger between
Oasis and C&C Electronics ("C&C"), a foreign corporation doing business in Texas. The
president, managing director, and 100% voting-share owner of C&C was appellee Coco Ciocan. 
The original agreement to work toward a merger foundered as Ciocan failed to generate business
contracts for Oasis, basically a condition precedent for moving toward merger under the original
agreement. By the middle of 1995, merger talks were heating up again as Ciocan was finalizing
a potential fourteen million dollar contract for developing a product for Yazaki, a Japanese
company. Van Bavel, however, was more reluctant to agree to a merger than was Knapp. In
response to his reluctance, van Bavel contends, Ciocan and Knapp began to secretly conspire to
bring about his ouster from Oasis. By late July 1995, Ciocan had expressed to Knapp concerns
about van Bavel remaining in a management position. On July 31, 1995, Knapp met with attorney
Jim Montgomery. Montgomery's billing records indicate the purpose of the meeting was to "meet
with David [Knapp] regarding problem shareholder."

 Ciocan came to Austin on August 2, 1995 to present his merger plan to Oasis and
its approximately twelve to fifteen employees. Montgomery's records indicate that on August 2 
he had a conference with Knapp, Ciocan, and others "to discuss matter [sic]," and that he drafted
"documents for various actions required to accomplish matters discussed." On August 3, Ciocan
presented his merger plan to the employees of Oasis, predicting a merged company with an
income of $300 million within a few years. A key part of the merger was the fourteen million
dollar contract that Ciocan asserted he had secured with Yazaki. Van Bavel testified that with
Ciocan's assurances that the Yazaki contract was a "done deal," he was willing to proceed with
the merger.

 Also on August 3, van Bavel signed documents presented to him by Ciocan that had
been prepared by Montgomery the previous day. Van Bavel asserts he was led to believe these
documents were merely in preparation for the Oasis-C&C merger, when in actuality they were
intended to lay the legal foundation for allowing Knapp and Ciocan to force van Bavel out of the
company. These documents amended Oasis's bylaws to increase the number of directors on the
board of directors from two to three and formally made Ciocan the third director. With van Bavel
having signed these documents, Ciocan told van Bavel that he did not want him to manage the
Yazaki project; a discussion ensued about the management structure of the post-merger Oasis. 
Ciocan did not want van Bavel to be president of Oasis any longer. Van Bavel made it clear that
he did not want to be subordinate to Knapp and suggested other possibilities such as his managing
parts of the business not associated with the Yazaki contract. Van Bavel told Ciocan he thought
Knapp would be a poor manager, negotiator, and representative for Oasis, and that Knapp could
not even "manage his own dog."

 On August 4, Montgomery's records indicate a meeting with Knapp and others to
discuss "removal of problem employee." Knapp and Ciocan later met with van Bavel and told
him they had considered his ideas about his position with Oasis management and had rejected
them. They offered to allow van Bavel to work for Oasis as a design engineer with no
management duties. Van Bavel said that was unacceptable and that he would resign. Van Bavel
testified he thought his resignation would be effective when the merger was completed. Instead,
Knapp returned to him in a couple of hours with a document entitled "Unanimous Consent
Resolutions of the Board of Directors" (the "Agreement"), which stated that van Bavel had been
removed as an officer of Oasis, and had resigned as an employee effective that day. Van Bavel
refused to sign the Agreement as it was, and he negotiated with Knapp for an immediate $100,000
payment in cash and an agreement to buy out his shares of stock in Oasis. As ultimately signed,
the Agreement provided that Oasis would immediately buy back van Bavel's non-vested shares
for a total of $266.26 and within thirty days would buy back his vested shares for a price to be
determined by a fair market valuation of the company: "[T]he Corporation agrees, within 30 days,
to have a fair market evaluation made of the company as of August 4, 1995, and agrees to purchase
Nicholas R. van Bavel's stock . . . at the fair market value price provided it makes business sense." 
(Emphasis added.)

 Within thirty days, Oasis notified van Bavel that its valuation determined the fair
market value of his remaining shares to be $199,500. Believing this value to be extremely low,
van Bavel sent a letter to Oasis and Knapp stating he felt the Agreement had been breached. 
Subsequently, van Bavel, individually and in his derivative capacity as a shareholder on behalf
of Oasis, filed suit against appellees. The trial court granted partial summary judgment in favor
of appellees on the issue of breach of the employment contract and wrongful termination of
employment. At trial, the jury was asked whether appellees had committed fraud, breach of
contract, and breach of fiduciary duty. The jury returned a verdict in favor of van Bavel on
nearly all nineteen questions submitted to it. The jury found Knapp, Ciocan, C&C and Oasis
liable for fraud and conspiracy to commit fraud; Knapp liable for breach of a fiduciary duty to van
Bavel; Ciocan and C&C liable for conspiracy to breach Knapp's fiduciary duty to van Bavel;
Oasis liable for breach of contract; and Knapp and Ciocan liable to Oasis for breach of fiduciary
duty to Oasis. The jury found both the fair market value of van Bavel's remaining stock and the
amount of damages caused by the fraud to be $1,667,700. The jury also found $100,000 damages
for the loss of van Bavel's "benefits of employment" and more than two million dollars in
exemplary damages. The trial court granted appellees' motion for judgment notwithstanding the
verdict, however, and rendered judgment that van Bavel take nothing.


DISCUSSION

 A trial court may disregard a jury's findings and grant a motion for judgment
notwithstanding the verdict only when there is no evidence upon which the jury could have made
its findings. Tex. R. Civ. P. 301; Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227 (Tex.
1990). In reviewing the granting of such a motion, the record is viewed in the light most
favorable to the jury findings, considering only the evidence and inferences that support the
findings and rejecting the evidence and inferences contrary to them. Johnson & Johnson Medical,
Inc. v. Sanchez, 924 S.W.2d 925, 929 (Tex. 1996). If there is more than a scintilla of competent
evidence to support the jury's finding, the judgment notwithstanding the verdict must be reversed. 
Mancorp, 802 S.W.2d at 228.


BREACH OF FIDUCIARY DUTY

 Van Bavel contends there is legally sufficient evidence to support the jury's liability
finding on claims of breach of fiduciary duty against Knapp and conspiracy claims against Ciocan
and C&C. The jury was asked if, between July 28, 1995 and August 4, 1995, Knapp and van
Bavel had a fiduciary relationship. The jury answered yes. The jury then found that Knapp
breached the fiduciary duty he owed to van Bavel and that Ciocan and C&C had engaged in a civil
conspiracy with Knapp to breach the fiduciary duty. Finally, the jury determined that the sum of
money that would compensate van Bavel for damages proximately caused to his "benefits of
employment" by Knapp's breach of fiduciary duty was $100,000.

 Texas courts have recognized that certain relationships give rise to a fiduciary duty
as a matter of law. See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823 S.W.2d
591, 593 (Tex. 1992) (e.g., partners, principal-agent, attorney-client). Some relationships have
been categorized as "special relationships" giving rise to the tort duty of good faith and fair
dealing, but not necessarily the fiduciary duty that requires a party to place the interest of the
other party before his own. Id. at 594. Texas courts have also recognized that certain informal
relationships may give rise to a fiduciary duty. Id. The existence of such "confidential
relationships" is usually a question of fact, although when the issue is one of no evidence, it
becomes a question of law. Id.

 Proof of a fiduciary duty outside the few formally recognized relationships may be
found when the dealings between the parties have continued for so long that one party is justified
in relying on the other to act in the former's best interest. See Consolidated Bearing & Supply
Co. v. First Nat'l Bank, 720 S.W.2d 647, 649 (Tex. App.--Amarillo 1986, no writ); Thomson v.
Norton, 604 S.W.2d 473, 476 (Tex. Civ. App.--Dallas 1980, no writ). The analysis in
Consolidated Bearing is instructive:


 Courts have been strict in applying this test, however, emphasizing the
distinction between factual proof of a confidential relationship and mere subjective
assertions by one party. Two cases factually compatible with this case are
illustrative. In Thigpen v. Locke, [363 S.W.2d 247 (Tex. 1962),] the Supreme
Court, while recognizing the principle that trust and confidence can arise
informally from purely personal relationships, refused to find a confidential
relationship between two parties to a deed when the grantee was a trust officer at
a local bank. The evidence showed that the Lockes had a long-standing business
and personal relationship with Thigpen, who was a director, officer and
shareholder in their corporation, but the court held that there was no evidence to
show that there existed anything more than a debtor-creditor relationship. Thigpen
v. Locke, 363 S.W.2d at 253.


 In contrast to Thigpen, the transaction in dispute in the present case is a
loan between the bank and another of its customers; it involves Consolidated only
indirectly. The corporation was not a party to the transaction it seeks to set aside.


 In Winston v. Lake Jackson Bank, [574 S.W.2d 628 (Tex. Civ.
App.--Houston [14th Dist.] 1978, no writ),] the endorsers of a promissory note
failed to prove that a fiduciary relationship existed between them and the bank,
requiring the bank to advise the endorsers of their potential individual liability
before getting their signatures. The endorsers submitted as evidence to support
their claim the following: (1) extensive prior dealings between the endorsers and
the bank; (2) the fact that the bank president had been a financial advisor to one of
the parties; and (3) the existence of prior notes entered into with the understanding
that the liability would be limited. Winston v. Lake Jackson Bank, 574 S.W.2d at
628. The court concluded that evidence showing the existence of a debtor-creditor
relationship for several years did not justify the endorser's assumption that the
bank would act in their interest.


 We reach the same conclusion here.



Consolidated Bearing, 720 S.W.2d at 649-50.


 In the present case, the question is whether the evidence concerning the relationship
between van Bavel and Knapp demonstrated anything more than the normal relationship between
two persons starting a new corporation. To this end, van Bavel points to evidence that he and
Knapp had been co-workers previously, had purchased a boat together with a third person, had
started Oasis together in 1993, had founded the company on a "50/50" basis (i.e., they worked
together the first several months with no salaries, made equal loans to the company, were paid
the same, and trusted each other to manage their respective projects), and had socialized with each
other, although by the time period pertinent to the jury question there was undisputed evidence
that they no longer socialized outside of the office and had not done so for months.

 Van Bavel presents three cases to demonstrate that a fiduciary duty may be found
to exist between persons involved in a closely held corporation. These cases do not further his
argument. In Duncan v. Lichtenberger, 671 S.W.2d 948, 951 (Tex. App.--Fort Worth 1984, writ
ref'd n.r.e.), minority shareholders brought suit against the majority shareholder for their
monetary contributions to the corporation after the majority shareholder fired plaintiffs from their
positions. As to the existence of a fiduciary duty, the court simply noted that the relationship of
officers and directors to a corporation is a fiduciary one imposing on them the duty to exercise
their powers as officers and directors solely for the benefit of the corporation and its shareholders. 
Id. at 952 (quoting Canion v. Texas Cycle Supply, Inc., 537 S.W.2d 510, 513 (Tex. Civ.
App.--Austin 1976, writ ref'd n.r.e.)). In the present case, however, the relevant relationship is
not Knapp's formal fiduciary relationship with Oasis (which is addressed below in the discussion
of the derivative action), but rather is the informal relationship with van Bavel as friend and co-director/shareholder/boat owner. Additionally, under this cause of action, van Bavel is not
seeking return of his monetary contribution as a shareholder, but damages for the loss of
employment.

 In Dodson v. Kung, 717 S.W.2d 385, 387-88 (Tex. App.--Houston [14th Dist.]
1986, writ ref'd n.r.e.), the two parties met in 1961 and formed a father/son relationship while
Dodson was still a boy. Over the years, Kung had twice turned down requests by Dodson for
financial assistance. In 1980, Kung and Dodson orally agreed to form a new construction
business, which was incorporated in December of that year. By 1983, the relationship had gone
sour. Dodson resigned and sued for breach of fiduciary duty, as well as for fraud and breach of
contract. The court noted that while a fiduciary relationship may arise informally from a purely
personal relationship or a business association not otherwise considered a fiduciary relationship,
the case under consideration was neither; while one party regarded the other as a "son/protégé"
and was in the superior position, there was no evidence that the lesser experienced man was naive
or that the men were not dealing with each other at arm's length and on equal business terms. Id.
at 389. In the present case, too, there is no evidence that Knapp and van Bavel were not dealing
with each other as equals.

 In Kaspar v. Thorne, 755 S.W.2d 151, 155 (Tex. App.--Dallas 1988, no writ), one
50% shareholder sued the other 50% shareholder for breach of fiduciary duty. The court
recognized that a fiduciary duty may exist in some circumstances and that whether such a duty
exists is usually a question for the fact finder. Id. However, the court noted that the question of
the existence of a fiduciary duty was not presented to the fact-finder. Id. We agree that a
fiduciary relationship may be found to exist between such parties under sufficient evidence, but
the facts in Kaspar offer no assistance to van Bavel's argument. In Kaspar, the two men had
known each other for thirty years and had been doing business together for several years as an
actual partnership before forming a corporation. Id. at 152. Nonetheless, the court concluded
as a matter of law that no fiduciary relationship existed between them. In the present case, Knapp
and van Bavel's relationship was of shorter duration than was the relationship in Kaspar, and there
is no evidence that van Bavel and Knapp ever conducted business as an actual partnership.

 The choice of business form is an important decision. There are advantages and
disadvantages that come with the choice between partnership and corporation. A corporation
offers its shareholders protection from liabilities of the corporation, but partners are jointly and
severally liable for partnership debts. While partners owe a fiduciary duty to each other, directors
and officers of a corporation owe a fiduciary duty to the corporation for the benefit of the
shareholders. See General Dynamics v. Torres, 915 S.W.2d 45, 49 (Tex. App.--El Paso 1995,
writ denied) (directors and officers owe fiduciary duty to corporation). Here, van Bavel and
Knapp were co-shareholders, co-officers and co-directors, not an uncommon situation in closely
held corporations. Finding a fiduciary duty, however, requires considerably more than the normal
circumstances of a closely held corporation. Cf. Schoellkopf v. Pledger, 739 S.W.2d 914, 920
(Tex. App.--Dallas 1987) (fiduciary relationship between stockholders in corporation may, with
sufficient evidence, be shown to exist in some instances), rev'd on other grounds, 762 S.W.2d
145 (Tex. 1988). (1) There must be some evidence on which the jury could rationally conclude that
it was reasonable for van Bavel to expect Knapp to put van Bavel's interests ahead of his own. 
The only other evidence of something beyond the typical facts of a closely held corporation was
that they owned a boat together. This is, as a matter of law, not enough. We conclude the
evidence is legally insufficient to demonstrate that a fiduciary relationship existed between van
Bavel and Knapp. The trial court did not err in rendering a take-nothing judgment on the breach
of fiduciary duty cause of action.


FRAUD

 Van Bavel contends there is legally sufficient evidence to support the jury's finding
that Knapp, Ciocan, C&C, and Oasis committed both common-law and statutory fraud, as well
as conspiracy to commit fraud, and to support the damages awarded by the jury. Tort damages
are available for fraud irrespective of whether the fraudulent representations are later subsumed
in a contract or whether the plaintiff suffers only economic loss related to the subject matter of
the contract. Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41,
47 (Tex. 1998).

 Common-law fraud consists of a material representation that was false, was made
with the knowledge of the falsity or without knowledge of the truth, was made as a positive
assertion, was made with the intent that it be acted upon by the other party, was acted upon by
the party in reliance on the misrepresentation, and caused injury to the party. Sears, Roebuck &
Co. v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994). Statutory fraud is fraud in a transaction
involving real estate or stock in a corporation, see Tex. Bus. & Com. Code Ann. § 27.01(a) (West
1987), and may be shown in two ways. First, statutory fraud consists of a false representation,
of past or existing material fact, made to a person for the purpose of inducing that person to enter
into a contract, and which is relied on by the person entering the contract. Id. § 27.01(a)(1). 
Second, statutory fraud may also be shown as a false and material promise to do an act, made with
the intention of not fulfilling it, to a person for the purpose of inducing that person to enter a
contract, and which is relied on by the person entering the contract. Id. § 27.01(a)(2).

 In the present case, van Bavel bases his allegations of fraud on two key
representations and the two measures of damages found by the jury. First, van Bavel asserts that
appellees never intended to pay him the fair market value ("FMV") for his stock in Oasis when
they signed the Agreement. (2) Second, van Bavel asserts that when he was asked to sign documents
on August 3 increasing the number of directors on Oasis's board of directors from two to three
and formally making Ciocan the third director, it was falsely represented to him that the purpose
of the documents was merely to facilitate a merger with C&C, when the actual purpose was to 
force van Bavel out of the company. The two elements of damages submitted to the jury were the
injury to van Bavel from the loss of his benefits of employment and the injury from the failure to
purchase his vested shares of stock.

 First, we consider the evidence of fraud surrounding the two key representations
that van Bavel asserts caused him injury. To demonstrate fraud from the asserted
misrepresentation that Knapp and Ciocan never intended to pay FMV, van Bavel presented the
following evidence: appellees sought to lower the valuation in ways CPA Harvey Corn described
as "inappropriate"; one of the accountants hired by Oasis to perform the valuation was not
independent but had done work for Oasis previously; appellees requested a valuation of van
Bavel's shares of stock (which were discounted for being a minority interest) instead of a valuation
of the company as a whole; van Bavel was never told that a minority discount would be used in
making the valuation; one accountant was asked to refigure his valuation after it produced a value
of more than $600,000 for van Bavel's stock; the sheer size of the discrepancy between appellees'
offer of $199,000 and the actual FMV of $1,667,700 as determined by the jury; and Knapp's
statement when the Agreement was signed that an accountant's valuation could end up being
higher or lower than van Bavel's estimated FMV of $20,000,000, implying it was roughly
correct.

 To prove fraud surrounding the asserted misrepresentation that the formal addition
of Ciocan as a director was merely in preparation for the merger, van Bavel introduced evidence
showing that Knapp and later Ciocan met with an attorney to discuss "problem shareholder" and
"removal of problem employee" and that the attorney drafted "documents for various actions
required to accomplish matters discussed," which were the documents van Bavel was asked to
sign. Van Bavel testified that Knapp had inquired about whether Ciocan had formally been made
a director, and van Bavel told him no. When asked why he was making these inquiries, Knapp
responded that it had something to do with the merger. On August 3, Ciocan handed van Bavel
documents to sign, explaining that "this is just stuff in preparation for the merger." Van Bavel
testified that he had no indication this might lead to his ouster. It was just after he signed these
documents that Ciocan first stated he did not want van Bavel in any type of control position or to
be president of Oasis anymore. The fraud asserted here is not merely a failure to disclose the true
intent behind having van Bavel sign the documents but the affirmative misrepresentation that the
only purpose of the documents was to prepare for the merger. (3)

 Regardless of whether we find legally sufficient evidence of fraud, however, van
Bavel cannot recover fraud damages as to his vested shares of stock. Appellees point out that the
transaction with respect to the vested shares of stock was never concluded and therefore van Bavel
still owns his shares. (4) Texas law recognizes two measures of direct damages for common-law
fraud: out-of-pocket damages and benefit-of-the-bargain damages. See Formosa Plastics, 960
S.W.2d at 49. The out-of-pocket measure computes the difference between the value of what the
plaintiff parted with and what he received; it allows the defrauded party to recover the actual
injury suffered. Id. The benefit-of-the-bargain measure computes the difference between the
value as represented and the value received; it allows for recovery of lost profits if such damages
are proved with reasonable certainty. For services fraudulently induced, value as represented may
be computed as actual cost of performance plus profits originally anticipated. Id. at 49-50. Both
measures, however, assume that the fraudulently induced transaction actually went through. In
the present case, no transfer of the stock occurred.


 Where, as is commonly the case, the defendant's actionable
misrepresentation or non-disclosure induces a transaction that involves the transfer
of something of value, courts normally resort to a general measure of damages
often referred to as direct damages, and, in addition thereto, will allow such other
damages as special or consequential damages as the plaintiff can prove.


 When the defendant's fraudulent conduct does not involve the transfer of
property, the plaintiff necessarily proves his claim by proving special or
consequential damages if he can do so.



W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 110, at 766-67 (5th ed. 1984);
see Formosa Plastics, 960 S.W.2d at 41 n.1 ("When properly pleaded and proved, consequential
damages that are foreseeable and directly traceable to the fraud and result from it might be
recoverable."); Texas Commerce Bank v. Lebco Constructors, Inc., 865 S.W.2d 68, 73-74 (Tex.
App.--Corpus Christi 1993, writ denied). Consequential damages to van Bavel regarding
appellees' anticipated purchase of his vested shares of stock were neither pleaded nor proven here. 
The evidence is therefore legally insufficient to support the jury's finding as to this element of
fraud damages.

 Even if he cannot recover damages relating to his vested stock, however, van Bavel
asserts that appellees' misrepresentations resulted in his resignation and caused him injury through
the loss of benefits of employment. Appellees respond that there is no evidence to support the
finding as to the loss of van Bavel's benefits of employment because there is no evidence that van
Bavel resigned in detrimental reliance on the misrepresentation concerning the Agreement. See
Johnson & Johnson Medical, 924 S.W.2d at 930 (detrimental reliance is essential element of
fraud). At trial, van Bavel testified that he resigned in response to the job offer of design
engineer. He clearly found it unacceptable that he would have no management duties and would
be subordinate to Knapp. He testified that Knapp and Ciocan knew he would resign in response
to this offer. When asked if he thought he would be giving up his ownership in the company
when he stated that he would resign rather than accept the position offered, van Bavel responded:
"Not at that instant, no. If--eventually if I resigned, I was--it kind of struck me, oh, yeah, there's
a buy/sell agreement and that would be part of my leaving, is that stock would get bought back
into the company." Van Bavel did not testify that he would have worked as a design engineer but
for the promise to pay FMV for his vested shares of stock. We conclude that there is no evidence
van Bavel relied on the asserted misrepresentation that appellees intended to pay him FMV in
resigning as an employee of Oasis.

 Nonetheless, van Bavel asserts the jury award is otherwise supported by evidence
of detrimental reliance on the misrepresentation concerning the documents signed on August 3.
Van Bavel argues that, based on his own testimony, the jury could have inferred he signed these
documents in reliance on the misrepresentation that the documents were just in preparation for the
merger. He argues that his signing these documents formally making Ciocan a director resulted
in his forced resignation. (5)

 Van Bavel's argument is premised on the assertion that it was his fraudulently
induced signature, increasing the number of directors to three and formally making Ciocan a
director, that caused him to be outnumbered as a director, setting the stage for his ouster. Van
Bavel offered into evidence the bylaws of Oasis. At the time in question, the bylaws of Oasis
allowed for only two directors. Although there was evidence that van Bavel had earlier repeatedly
treated Ciocan as a director, (6) under the bylaws Ciocan was not formally a director. Directors are
elected by the shareholders under article III, section 3 of the bylaws. In September 1994, Ciocan 
purchased shares of stock in Oasis, albeit very few. Van Bavel does not dispute that Ciocan was
a shareholder in August 1995. Article IX, section 2 of the Oasis bylaws states that unless a bylaw
adopted by the shareholders provides otherwise, either the directors or the shareholders may
amend the bylaws. Indeed, the document van Bavel signed on August 3 was an amendment of
the bylaws and election of an additional director by the shareholders (including Ciocan). Because
Ciocan was already a shareholder when van Bavel signed the August 3 document, van Bavel was
already outnumbered in shares. We conclude, therefore, that the asserted misrepresentation upon
which van Bavel relied in signing the documents did not cause him to be outnumbered in a way
that set the stage for his ouster; he was already outnumbered.

 Because van Bavel may not recover damages relating to his stock from the asserted
fraud here, because there is no evidence that he resigned in detrimental reliance on the stock-purchase representation in the Agreement, and because there was no evidence that his allegedly
fraudulently induced signing of the August 3 documents caused his ouster, we conclude the trial
court did not err in rendering a take-nothing judgment on van Bavel's fraud claim.


BREACH OF CONTRACT

 Van Bavel next contends there is legally sufficient evidence to support an award
for breach of contract and damages from that breach. The jury found that Oasis had breached
the clause in the Agreement that states, "Resolved, that the Corporation agrees, within 30 days,
to have a fair market evaluation made of the company as of August 4, 1995, and agrees to
purchase Nicholas R. Van Bavel's stock which is not repurchased according to the Shareholders
Buy-Sell agreement dated June 25, 1994, at the fair market value price provided it makes business
sense."

 The jury was then asked to determine the fair market value of van Bavel's stock
in Oasis as of August 4, 1995. The jury answered $1,667,700. Van Bavel asserts the trial court
erred in not either granting this amount in damages or granting specific performance. (7) In
reviewing the trial court's judgment that van Bavel take nothing, we engage in a legal-sufficiency
review. See Johnson & Johnson Medical, 924 S.W.2d at 929. The grant or denial of specific
performance, however, rests in the sound discretion of the trial court. American Apparel Prods.,
Inc. v. Brabs, Inc., 880 S.W.2d 267, 269 (Tex. App.--Houston [14th Dist.] 1994, no writ).

 Appellees assert this clause was not enforceable because the phrase "provided it
makes business sense" renders the provision too indefinite to be enforceable as a contract. We
conclude that even assuming the provision is enforceable and the business-sense clause is not too
indefinite, the trial court did not err in rendering a take-nothing judgment. Even assuming breach
and FMV of $1,667,700, there is no finding on whether it would make business sense for Oasis
to repurchase the stock at that price. (8) We must therefore deem that the trial court found in such
a manner as to support the judgment, i.e., that it did not make business sense for Oasis to buy
back van Bavel's stock for $1,667,700. (9) See Tex. R. Civ. P. 279; Strain v. Gansle, 768 S.W.2d
345, 347 (Tex. App.--Corpus Christi 1989, writ denied); LeBlanc, Inc. v. Gulf Bitulithic Co., 412
S.W.2d 86, 94 (Tex. Civ. App.--Tyler 1967, writ ref'd n.r.e.) (absence of jury finding on
causation could give rise to deemed finding). The trial court did not err in failing to grant van
Bavel damages or specific performance in his breach of contract claim.


DERIVATIVE ACTION AS A SHAREHOLDER

 Finally, van Bavel contends the evidence was legally sufficient to support the jury's
finding that Knapp and Ciocan had breached their fiduciary duty to Oasis Design and that Oasis
Design was entitled to actual and exemplary damages. Both Knapp and Ciocan were directors of
Oasis Design; they owed a fiduciary duty to the corporation as a matter of law. See General
Dynamics, 915 S.W.2d at 49. The jury was instructed that although officers and directors must
act fairly and in the best interest of the corporation, a director is not liable for his conduct if it
falls within the protection of the "business judgment rule." (10) See International Bankers Life Ins.
Co. v. Holloway, 368 S.W.2d 567, 576-77 (Tex. 1963) (discussing "extreme measure of candor,
unselfishness, and good faith" required by director's fiduciary duty to corporation); Langston v.
Eagle Publishing Co., 719 S.W.2d 612, 616 (Tex. App.--Waco 1986, writ ref'd n.r.e.) (under
business-judgment rule, conduct that is merely unwise, inexpedient, or imprudent will not sustain
suit against management of corporation by shareholders).

 The jury found that both Knapp and Ciocan had breached their duty to Oasis by
failing to comply with the standards of a fiduciary. The jury was then asked what sum of money
would compensate Oasis for damages caused by the breach; the jury answered $500,000. The
jury also awarded exemplary damages.

 As evidence of a breach of their fiduciary duty to the corporation, van Bavel asserts
that, by forcing him out, Knapp and Ciocan deprived Oasis of its most effective management
member for their own personal reasons. A former key employee testified that van Bavel was a
better negotiator than Knapp. By getting rid of van Bavel, Ciocan was in a better position to
negotiate more favorable terms with Knapp for the merger with his own company, C&C, than
would have been possible with van Bavel. Knapp testified that he was not happy with his
relationship with van Bavel and that van Bavel was a very argumentative and difficult co-worker. 
The record contains evidence that Ciocan had plans to demand full control of Oasis, and that
Knapp joined with Ciocan to get rid of van Bavel without exploring Ciocan's plans in detail. Van
Bavel testified that Oasis had a severe financial downturn after his departure. We believe the
foregoing is more than a scintilla of evidence showing Knapp and Ciocan breached their fiduciary
duty to Oasis and is legally sufficient to support the jury finding.

 Van Bavel next asserts the evidence is legally sufficient to support the jury's finding
that $500,000 in damages were caused by this breach. The jury was instructed to consider as
elements of damages "loss of profits" Oasis would have made but for the breach and "loss of fair
market value" that Oasis suffered as a result of the breach. Appellees point out that lost profits
must be proven with reasonable certainty. See Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d
80, 84 (Tex. 1992). While recovery of lost profits does not require that the loss be susceptible
to exact calculation, opinions or estimates of lost profits must be based on objective facts, figures,
or data from which the amount of lost profits may be ascertained. See id.; Szczepanik v. First
Southern Trust Co., 883 S.W.2d 648, 649 (Tex. 1994). A claimant must quantify the damages
as net loss to the company, not just lost income. Holt Atherton, 835 S.W.2d at 84.

 To show damages here, van Bavel offered into evidence five graphs, which were
prepared by van Bavel and CPA Harvey Corn based on information provided by Oasis. The
graphs were used to show the quarterly financial performance of Oasis from fourth quarter 1993
to third quarter 1996. The first graph showing "sales" and the second graph showing "expenses"
were combined to produce the third graph showing "earnings." The fourth graph shows "cash
balance," while the final graph shows price per share according to van Bavel's fair market value
formula, a formula that had been used during van Bavel's tenure at Oasis in promoting the
company to potential employees and customers. The formula used was twenty times "earnings"
(see graph three), plus the liquidation value of the company and an estimated goodwill value. 
These graphs appear to show a clear decrease in the financial performance of the company
beginning with the third quarter of 1995, the quarter in which van Bavel left Oasis.

 According to graph three, while Oasis had positive earnings of more than $400,000
each of the three quarters preceding van Bavel's departure, it posted negative earnings totaling
$500,000 in the two quarters beginning with the quarter in which van Bavel left. During closing
argument, counsel for van Bavel asked the jury to look at how Oasis was performing before van
Bavel's departure and the losses in the following six months, and suggested the jury should award
at least $500,000. While there was no evidence presented of what van Bavel estimates Oasis
would have earned had he stayed, the jury could have inferred that since Oasis had positive
earnings before van Bavel left, it would have at least broken even had van Bavel stayed. As a
consequence of the negative earnings and a decreasing cash balance, graph five shows a fair
market value of Oasis's stock at a high of more than $6 per share in the second and third quarters
1995 dropping to a negative value in second quarter 1996. We conclude these graphs provide
more than a scintilla of evidence of the amount of damages to Oasis's financial status found by
the jury.

 To find that these damages were proximately caused by the forced exit of van
Bavel, the jury could have rationally inferred causation from the fact that the financial downturn
demonstrated in the graphs roughly coincided with van Bavel's departure. Testimony that van
Bavel was the better negotiator and manager and that he ran the business side of the company
could have led the jury to conclude that his forced departure caused the downturn. We conclude
that the evidence of causation, though meager, is legally sufficient to support the jury's finding
that damage to Oasis's financial status was caused by Knapp's and Ciocan's breaches of fiduciary
duty. We sustain points of error 28 and 29.

 Appellees raise a cross-point of error asserting that the evidence is factually
insufficient to support the jury's findings as to the derivative action. We agree.

 A factual-sufficiency review requires the court to consider and weigh all of the
evidence and set aside the verdict and remand for a new trial if the court concludes that the
evidence supporting the verdict is so weak, or the evidence to the contrary so overwhelming, as
to make it manifestly unjust. In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951); West v.
Watkins, 594 S.W.2d 800, 802 (Tex. Civ. App.--San Antonio 1980, writ ref'd n.r.e.).

 Appellees presented evidence showing that the accounting method used by van
Bavel in the preparation of his graphs skewed the true financial picture of Oasis's financial
performance. Many of Oasis's contracts with its customers employed a "milestone" basis
whereby Oasis was paid as various milestones were reached even though substantial work
remained to be done. In showing Oasis's income on his graphs at trial, however, van Bavel
reported the income in the quarter it was received (the "cash" method). Appellees presented
evidence that a "percentage of completion" method in which income is reflected as the work
earning the income is actually done is the method that comports with generally accepted
accounting principles. (11) The result is that an inordinately high percentage of income for projects
showed up on the graphs for the periods before van Bavel left while an inordinately high
percentage of expenses for the same projects showed up on the graphs for the periods after he left. 
Thus, the use of the cash method by van Bavel appears to create the false appearance of a sudden
disastrous downturn. Appellees point out that at the time of trial Oasis had more employees than
ever. Several of these employees testified at trial that the company was doing well.

 The evidence also shows that nearly as much of the decrease in earnings shown in
van Bavel's graph three is attributable to an increase of expenses as to a decrease in sales. Van
Bavel did not present evidence suggesting how his absence caused an increase in expenses. 
Additionally, there is evidence that some of the decrease in earnings was simply the result of the
company's efforts during 1995 being directed toward the merger with C&C, rather than the result
of van Bavel's absence. (12) Indeed, once the time period during which the merger was under
consideration had passed, even van Bavel's graphs show that Oasis experienced a strong financial
upturn.

 Finally, we note that van Bavel was asked by his attorney what fair market value
was indicated for third quarter 1996 on his graph five. Van Bavel responded he could look at "the
printout" and tell, but that it was hard to tell from the graph. No "printout" was offered into
evidence, leaving the graphs as essentially the only evidence of damages.

 Having considered and weighed all of the evidence, we conclude that the evidence
supporting the jury's finding as to damages in the derivative action is so weak, and the evidence
to the contrary so strong, as to render the finding manifestly unjust. See Fleming Mfg. Co., Inc.
v. Capitol Brick, Inc., 734 S.W.2d 405, 407-08 (Tex. App.--Austin 1987, writ ref'd n.r.e.)
(remanding case for consideration of lost profits due to factually insufficient evidence of the
amount of damages). We sustain appellees' cross-points four and six. We need not consider the
remaining cross-points.

CONCLUSION

 Having concluded that the trial court erred in granting judgment notwithstanding
the verdict as to van Bavel's derivative claim, we sustain points of error 28 and 29. Because we
also conclude that the evidence is factually insufficient to support the jury's findings as to the
derivative claim, however, we sustain cross-points four and six and remand that claim to the trial
court for a new trial. (13) In all other respects, we overrule van Bavel's points of error and affirm
the trial court's judgment.



 

 J. Woodfin Jones, Justice

Before Justices Aboussie, Jones and Kidd

Affirmed in Part; Reversed and Remanded in Part

Filed: August 31, 1998

Do Not Publish

1. In Crim Truck, the question was whether a fiduciary relationship existed between the parties
to a franchise agreement. The court acknowledged that finding a fiduciary duty would present
a clash between one's freedom to contract and such a duty. See Crim Truck, 823 S.W.2d at 594. 
In Consolidated Bearing, the court pointed out the potential conflict between fiduciary duties if
the defendant-bank owed one duty to the plaintiff-bank customer and other duties to other bank
customers. See Consolidated Bearing, 720 S.W.2d at 650. We note that a potential conflict
would exist if a director owed one duty to a single co-director/shareholder and owed a separate
duty to the corporation for the benefit of all shareholders. Though such a potential conflict does
not negate the possibility that two duties may be found, it makes us even more reluctant to impose
a duty based on an informal relationship as friends, especially where a duty based on a formal
relationship already exists for the protection of shareholders.
2. Van Bavel cites appropriate language in discussing appellate review of the first
misrepresentation:


A promise to do an act in the future is actionable fraud when made with the intention,
design and purpose of deceiving, and with no intention of performing the act. While
a party's intent is determined at the time the party made the representation, it may be
inferred from the party's subsequent acts after the representation is made. Intent is a
fact uniquely within the realm of the trier of fact because it so depends upon the
credibility of the witness and the weight to be given their testimony.


Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434-35 (Tex. 1986) (citations omitted).
3. Where the circumstances impose a duty to speak, silence can act as a false representation. 
Fisher Controls Int'l, Inc. v. Gibbons, 911 S.W.2d 135, 140 (Tex. App.--Houston [1st Dist.]
1995, writ denied). We have already concluded that Knapp owed no fiduciary duty to van Bavel
and there is no assertion that Ciocan owed such a duty to van Bavel. However, if a person makes
a partial disclosure, he may assume the duty to tell the whole truth even where there was no duty
to make the partial disclosure. See Trustees of Northwest Laundry & Dry Cleaners Health &
Welfare Trust Fund v. Burzynski, 27 F.3d 153 (5th Cir. 1995); see also Tex. Jur. 3d Fraud and
Deceit § 8 (1998) (cause of action for fraud may be sustained for declarant's knowing failure to
disclose material information necessary to prevent her statement from being misleading).
4. Van Bavel argues that appellees waived this argument because, although appellees asserted
it in their motion for judgment notwithstanding the verdict, they failed to object to the charge to
the jury on this basis and failed to request an instruction using the proper measure of damages in
substantially correct form. Appellees did, however, object to the relevant jury question on the
basis that there was no evidence to support its submission to the jury. We conclude that the issue
was not waived.
5. Van Bavel also asserts Ciocan made the false representation in early August 1995 that the
Yazaki contract was a "done deal" and that without that assurance he would not have been
cooperative in proceeding with acts in furtherance of the merger, including signing the documents
presented to him on August 3. Appellees presented evidence that an agreement was signed by
Ciocan and Yazaki on June 27, 1995 stating that the parties intended to complete a final contract
by July 27, 1995 and outlining the terms and conditions of the contract. Ciocan testified that
Japanese to English translation problems slowed the process but that the final contract on the deal
was signed on September 5, 1995.
6. On November 19, 1994 and again on March 20, 1995, van Bavel signed documents stating
"We the undersigned, being all the directors of Oasis Design, Inc., a Texas corporation, hereby
waive notice of the meeting of the board of directors of the corporation . . . ." The undersigned
were van Bavel, Knapp, and Ciocan. Additionally, on July 19, 1994, van Bavel sent an e-mail
to a Japanese businessman stating, "We have the greatest respect for Mr. Ciocan; in fact, Mr.
Ciocan is on the Board of Directors of Oasis Design."
7. Van Bavel did not specifically request specific performance in his pleadings, but asserts that
his plea for general relief supports a judgment for specific performance. See Davis v. Alwac Int'l,
Inc., 369 S.W.2d 797, 802 (Tex. Civ. App.--Beaumont 1963, writ ref'd n.r.e.).
8. The business-sense clause of the Agreement has meaning only in the context of a particular
amount to be paid for van Bavel's shares. Consideration of the business-sense clause was included
in the jury question on breach, but was not included in the jury question asking the jury to
determine the FMV of van Bavel's stock as of August 4, 1995.
9. We find factually sufficient evidence in the record to support such a deemed finding. See
Tex. R. Civ. P. 279.
10. Under the business-judgment rule, the jury was instructed that a director will not be held
liable for an honest mistake of judgment if he acted with due care, in good faith, and in
furtherance of a rational business purpose.
11. There was also evidence that van Bavel himself had used the "percentage of completion"
method at Oasis for tax purposes to delay paying taxes on income.
12. The merger was eventually scuttled when Knapp and key employees at Oasis realized that
Ciocan wanted to have sufficient stock in Oasis, with voting rights, that would essentially give
him ultimate veto power over all Oasis decisions.
13. Because the issue of liability is contested here and the derivative action involves
unliquidated damages, we are precluded from remanding that cause of action only on the issue of
damages. Tex. R. App. P. 44.1(b); see Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642
S.W.2d 160, 166 (Tex. 1982); County Management, Inc. v. Butler, 650 S.W.2d 888, 893 (Tex.
App.--Austin 1983, writ dism'd by agr.).


resentation. 
Fisher Controls Int'l, Inc. v. Gibbons, 911 S.W.2d 135, 140 (Tex. App.--Houston [1st Dist.]
1995, writ denied). We have already concluded that Knapp owed no fiduciary duty to van Bavel
and there is no assertion that Ciocan owed such a duty to van Bavel. However, if a person makes
a partial disclosure, he may assume the duty to tell the whole truth even where there was no duty
to make the partial disclosure. See Trustees of Northwest Laundry & Dry Cleaners Health &
Welfare Trust Fund v. Burzynski, 27 F.3d 153 (5th Cir. 1995); see also Tex. Jur. 3d Fraud and
Deceit § 8 (1998) (cause of action for fraud may be sustained for declarant's knowing failure to
disclose material information necessary to prevent her statement from being misleading).
4. Van Bavel argues that appellees